72 Cal.Rptr.3d 27 (2008)
159 Cal.App.4th 1010
In re J.L., a Person Coming Under the Juvenile Court Law.
Solano County Health and Social Services Department, Plaintiff and Respondent,
v.
Adrian L., Defendant and Appellant; Christopher W., Intervener and Respondent.
No. A117045.
Court of Appeal of California, First District, Division One.
February 1, 2008.
*29 Darlene Azevedo Kelly, under appointment by the Court of Appeal, for Defendant and Appellant.
Conrad S. Lee, under appointment by the Court of Appeal, for Intervener and Respondent.
Dennis Bunting, County Counsel, Azniv Darbinian, Assistant County Counsel, Lori Mazzella, Deputy County Counsel for Plaintiff and Respondent.
Certified for Partial Publication.[*]
*28 MARGULIES, J.
Appellant Adrian L. executed a voluntary declaration of paternity upon the birth of J.L. and lived with J.L. and his mother, Kristi G. (Mother), for the first year of J.L.'s life. When J.L. was 13 months old, Adrian and Mother left without warning on a trip to Mexico, abandoning J.L. with friends. As a result, the Solano County Health and Social Services Department (Agency) detained J.L. and filed a petition under section 300 of the Welfare and Institutions Code.
Within two weeks after J.L. was abandoned, before Adrian and Mother had returned from Mexico, Christopher W. appeared at a hearing and told the juvenile court that he suspected he was J.L.'s biological father. After the results of a paternity test confirmed these suspicions, the court' adjudged Christopher to be J.L.'s legal father.
Because Adrian had been jailed immediately upon his return from Mexico on the basis of Mother's allegations of kidnapping, Adrian's claim to presumed paternity arising from the voluntary declaration was not brought to the court's attention until substantially later in the proceedings. After being informed of Adrian's claim, the juvenile court set aside his voluntary declaration of paternity, reaffirmed Christopher's status as J.L.'s presumed and legal father, and granted custody of J.L. to Christopher. We affirm.

I. BACKGROUND
In June 2006, when J.L. was just over a year old, the Agency filed a petition under Welfare and Institutions Code section 300, subdivision (b) alleging that Mother was unable adequately to supervise and protect J.L.
At the time of J.L.'s birth in May 2005, Mother was unwed but involved with Adrian. Mother and Adrian executed a voluntary declaration of paternity, and Adrian was identified as J.L.'s father on the birth certificate. For the next year, Adrian acted as J.L.'s father, living with and financially supporting Mother and J.L.
Prior to J.L.'s birth, Christopher suspected he might be the baby's father, but Mother repeatedly told him he was not.[1] When Christopher "tried to do something *30 about [his status as father]," Adrian visited Christopher's place of work and warned him to stay away from Mother. Following J.L.'s birth, Adrian continued to harass Christopher, visiting his home and threatening him. Christopher eventually moved to Texas, primarily to get away from Adrian. While living in Texas, Christopher married.
Adrian had a history of violent and obsessive behavior. He was the subject of a domestic violence restraining order and criminal charges associated with stalking an ex-girlfriend in 2003. In December 2005, when J.L. was seven months old, Adrian disappeared with Mother and J.L. after an argument, causing Mother's family to file a missing person report. The three were found a week later living at a hotel. On June 12, 2006, after J.L.'s first birthday, Mother filed a police report claiming that Adrian had hit her and attempted to take J.L. After Mother escaped to her father's home later that day, Adrian went to the home and, while confronting Mother's father at knifepoint, ran off with J.L. The next day, Mother sought an emergency restraining order against Adrian. The same day, the police located Adrian and returned J.L. to Mother.
Four days later, on June 17, while two friends were visiting Mother at her home, Adrian arrived and persuaded Mother to leave with him. J.L. was left with Mother's friends. After Mother stopped answering her cell phone under ominous circumstances, the police were called. It was not until six days later, June 23, that Mother was located in Mexico. In the meantime, Mother's friends had taken J.L. to Mother's father's home, and the Agency was notified of the situation. When Mother returned home, many days later, she claimed that Adrian had forced her to go to Mexico, and he was taken into custody in Southern California.
The juvenile court held a detention hearing on June 27, 2006, in the absence of Mother and Adrian, who presumably were still in Mexico. The court appointed counsel for each of them, ordered that Adrian be denied contact with J.L. and that Mother have only supervised visits, and scheduled a further hearing for July 5. The court expressly reserved the issue of paternity, and no mention was made of Adrian's execution of a voluntary declaration of paternity.[2]
Christopher attended the July 5 hearing, but Mother and Adrian did not. Their appointed counsel had been unable to get in touch with them and speculated that they were still in Mexico. Christopher informed the court that Mother had called him in Texas a few weeks prior, apparently when she was being threatened by Adrian in June, and acknowledged for the first time that he was J.L.'s biological father. Christopher had returned to California in response to this call. Since arriving, Christopher had contacted Mother's father and begun visiting J.L. Christopher asked the court to order a paternity test. The court granted the request and appointed counsel for Christopher.
Mother and Christopher attended the next hearing, held five weeks later. Adrian's attorney, only recently having learned that Adrian might be in custody, asked to be relieved of his representation until and unless Adrian expressed an interest in the proceedings. Neither Mother nor any of the attorneys involved brought Adrian's *31 declaration of paternity to the court's attention, and counsel's request was granted.
At the next hearing, held on August 29, 2006, in the absence of Adrian and his relieved counsel, the court learned that the genetic test had confirmed Christopher's paternity. The court, without objection, declared Christopher a presumed father, and a judgment declaring Christopher to be J.L.'s legal father was entered soon after. A contested jurisdictional hearing was held on September 26. At the hearing, counsel revealed that Adrian was in custody on the charge of kidnapping Mother. In Adrian's absence, the juvenile court sustained the allegations of the petition and found J.L. to be a child described by Welfare and Institutions Code section 300.
The dispositional hearing, postponed several times, was commenced on November 13. The dispositional report prepared by the Agency disclosed that Adrian was listed as J.L.'s father on his birth certificate. At the hearing, the juvenile court recognized that Adrian's designation on the birth certificate could only have occurred if he had executed a voluntary declaration of paternity. The court informed counsel that Adrian's execution of the declaration made him a presumed father, thereby leaving J.L. with two presumed fathers, and the hearing was continued until proper notice had been given to Adrian. It was eventually learned that Adrian was incarcerated in federal custody in Sacramento. Two orders were issued to secure his attendance at the proceedings, but efforts to secure his presence ceased when the federal authorities holding Adrian refused to comply with the orders.
In late January 2007, Christopher's counsel filed a request to set aside Adrian's voluntary declaration of paternity in favor of Christopher's claim. Adrian's counsel, who had been re-appointed, filed a declaration opposing the set aside, arguing that Adrian had acted as J.L.'s father from the time of his birth and had bonded with J.L. At a hearing on February 5, the juvenile court granted Christopher's request and designated Christopher J.L.'s presumed father. As explanation, the court's written order stated only that Christopher "made greater efforts."
At the next hearing, the juvenile court awarded custody to Christopher pursuant to Welfare and Institutions Code section 361.2, subdivision (a), which requires placement of a section 300 child with a noncustodial, non-offending parent if no detriment would result from the placement. A final judgment was entered awarding to Christopher legal and physical custody of J.L.

II. DISCUSSION
Adrian argues, for a variety of reasons, that the juvenile court erred in its conduct of the proceedings, in setting aside his declaration of paternity, and in awarding custody to Christopher. Adrian also argues that he was denied effective assistance of counsel.
The Uniform Parentage Act (Fam.Code, § 7600 et seq.)[3] (Act) provides the statutory framework by which California courts make paternity determinations. (Dawn D. v. Superior Court (1998) 17 Cal.4th 932, 937, 72 Cal.Rptr.2d 871, 952 P.2d 1139; § 7610, subd. (b).) Under this statutory scheme, California law distinguishes "alleged," "biological," and "presumed" fathers. (Francisco G. v. Superior Court (2001) 91 Cal.App.4th 586, 595, 110 Cal. Rptr.2d 679.) "A man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father *32 status, is an `alleged' father. [Citation.]" (In re Zacharia D. (1993) 6 Cal.4th 435, 449, fn. 15, 24 Cal.Rptr.2d 751, 862 P.2d 751.) "A biological or natural father is one whose biological paternity has been established, but who has not achieved presumed father status." (Ibid.)
"Presumed" fathers are accorded far greater parental rights than alleged or biological fathers. (In re Zacharia D., supra, 6 Cal.4th at pp. 448-49, 24 Cal. Rptr.2d 751, 862 P.2d 751.) Presumed father status is governed by section 7611, which sets out several rebuttable presumptions under which, a man may qualify for this status, generally by marrying or attempting to marry the child's mother or by publicly acknowledging paternity and receiving the child into his home. (In re Jerry P. (2002) 95 Cal.App.4th 793, 802-803, 116 Cal.Rptr.2d 123; § 7611, subds. (b)-(d).) Biological fatherhood does not, in and of itself, qualify a man for presumed father status under section 7611. On the contrary, presumed father status is based on the familial relationship between the man and child, rather than any biological connection. (In re T.R. (2005) 132 Cal. App.4th 1202, 1209-1210, 34 Cal.Rptr.3d 215.)
Section 7611 also recognizes two other grounds for qualification as a presumed father that are outside of the Act. These are an executed voluntary declaration of paternity (§ 7570 et seq.) and the so-called conclusive presumption of paternity (Dawn D. v. Superior Court, supra, 17 Cal.4th.at p. 935, 72 Cal.Rptr.2d 871, 952 P.2d 1139; § 7540), which dictates the finding that a mother's husband is her child's father, provided the mother and her husband were married and cohabiting when the child was conceived. In addition, as discussed in more detail post, an unmarried biological father may, under narrow circumstances, assert constitutional paternity rights, even though he does not qualify under any of the presumptions listed in section 7611. (Adoption of Kelsey S. (1992) 1 Cal.4th 816, 849, 4 Cal.Rptr.2d 615, 823 P.2d 1216 (Kelsey S.); Gabriel P. v. Suedi D. (2006) 141 Cal.App.4th 850, 860, 46 Cal.Rptr.3d 437.)
Occasionally the complicated pattern of human relations gives rise to more than one legitimate claimant to presumed father status, and the juvenile court must resolve the competing claims. As the Supreme Court explained in In re Jesusa V. (2004) 32 Cal.4th 588, 603, 10 Cal.Rptr.3d 205, 85 P.3d 2 (Jesusa V.), "[a]lthough more than one individual may fulfill the statutory criteria that give rise to a presumption of paternity, `there can be only one presumed father.' [Citations.]" The procedure for reconciling competing presumptions is stated in section 7612, which provides: "(a) ... a presumption under Section 7611 is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence. [¶] (b) If two or more presumptions arise under Section 7611 which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls." (See Jesusa V., at p. 603, 10 Cal.Rptr.3d 205, 85 P.3d 2.)

A. Jurisdiction to Set Aside the Voluntary Declaration of Paternity

Adrian first contends that the juvenile court was without jurisdiction to set aside his voluntary declaration of paternity because Christopher lacked standing to challenge it.
The purpose of a voluntary declaration of paternity is to' permit unwed parents to acknowledge the man's biological paternity of their child. After a birth by an unmarried mother, section 7571 requires the hospital to inquire about the execution of a *33 voluntary declaration of paternity by the mother and the man "identified by the natural mother as the natural father." (Id., subd. (a).) The text of the voluntary declaration requires the mother to swear that "the man who has signed the voluntary declaration of paternity is the only possible father" of her child. (§ 7574, subd. (b)(5).) Once executed, a voluntary declaration of paternity "establishes] the paternity of a child and shall have the same force and effect as a judgment for paternity issued by a court of competent jurisdiction." (§ 7573.)
Recognizing the possibility of second thoughts and error, the Act permits a voluntary declaration of paternity to be rescinded by either parent within the first two months. It also requires the court to set aside a voluntary declaration upon conclusive proof that the man signing the declaration was not, in fact, the biological father of the child, unless the court finds that setting aside the declaration would not be in the child's best interests. (§ 7575, subd. (b)(1), (3); Gabriel P. v. Suedi D., supra, 141 Cal.App.4th at p. 858, 46 Cal. Rptr.3d 437.) A motion to set aside a voluntary declaration may be filed only within the first two years after the child's birth "by a local child support agency, the mother, the man who signed the voluntary declaration as the child's father, or in an action to determine the existence or nonexistence of the father and child relationship pursuant to Section 7630 or in any action to establish an order for child custody, visitation, or child support based upon the voluntary declaration of paternity." (§ 7575, subd. (b)(3).)
Adrian contends that the juvenile court erred in permitting Christopher to move to set aside his voluntary declaration of paternity because subdivision (b)(3)(A) of section 7575 restricts the right to contest such a declaration to the three parties expressly mentioned in the statute: "a local child support agency, the mother, the man who signed the voluntary declaration as the child's father." In support, he cites In re Christopher M. (2003) 113 Cal. App.4th 155, 6 Cal.Rptr.3d 197 (Christopher M.), in which the court refused to grant a claimed biological father's request for genetic testing to challenge a voluntary declaration of paternity in a proceeding under Welfare and Institutions Code section 300. The court held, without explanation or analysis, that "with limited exceptions not applicable here, a motion for testing may be brought only by a child support agency, the child's mother, or the man who signed the voluntary declaration. (Fam.Code, § 7575, subd. (b).)" (Christopher M., at p. 164, 6 Cal.Rptr.3d 197.)
To the extent it implies that Christopher would lack standing to challenge Adrian's voluntary declaration in this proceeding, we respectfully disagree with Christopher M.'s interpretation of section 7575.[4] Subdivision (b)(3)(A) states that a motion for testing may be filed "by a local child support agency, the mother, the man who signed the voluntary declaration as the child's father, or in an action to determine the existence or nonexistence of the father and child relationship pursuant to Section 7630 or in any action to establish an order for child custody, visitation, or child support based upon the voluntary declaration of paternity." (Italics added.) The listing of the two types of proceedings in addition to the three specific parties, all connected by "or," indicates that a voluntary declaration may be challenged by the three specific parties or during the listed *34 proceedings. The plain meaning of this language is that a motion to set aside can be filed by one of the three listed parties, or by a participant in a section 7630 paternity action, or by a participant in "any action to establish an order for child custody, visitation, or child support based upon the voluntary declaration of paternity." The language places no constraint on the nature of the challenging party when the request for testing is made in the context of the listed proceedings.
We find support for this reading in the structure of section 7630, governing paternity actions. Section 7630 permits a paternity action to be brought by "[a] child, the child's natural mother, a man presumed to be the child's father ..., an adoption agency to whom the child has been relinquished, or a prospective adoptive parent of the child." (Id., subd. (a).) If the language of section 7575, subdivision (b) were to be interpreted as Adrian claims, the only parties who would be entitled to challenge a declaration of paternity in a section 7630 paternity action would be "a local child support agency, the mother, [and] the man who signed the voluntary declaration as the child's father," despite the express authorization in section 7630 for other parties to file a paternity action. In other words, while "[a] child, ... a man presumed to be the child's father ..., an adoption agency to whom the child has been relinquished [and] a prospective adoptive parent of the child" would be entitled to file a paternity action, Adrian's reading of section 7575 would bar them from challenging a declaration of paternity asserted in that action. Adrian suggests no policy reason for granting these parties the right to file a paternity action, on the one hand, and drastically limiting the scope of issues they can raise in that action, on the other. On the contrary, the use of the first "or" in section 7575, subdivision (b)(3)(A) was presumably intended to indicate that the initial listing of three parties did not restrict the type of parties who may file a motion to set aside in a section 7630 action.
Similarly, the second "or" in section 7575, subdivision (b)(3)(A) indicates that a participant in "any action to establish an order for child custody, visitation, or child support based upon the voluntary declaration of paternity" may also move to set aside a declaration of paternity. This interpretation finds support in the broad obligation of a juvenile court to determine the paternity of children involved in Welfare and Institutions Code section 300 proceedings (e.g., Cal. Rules of Court, rule 5.635) and by section 7551, which permits the court to order a genetic test of paternity "[i]n a civil action or proceeding in which paternity is a relevant fact." From these provisions, it is clear that the Legislature intended to grant juvenile courts broad discretion to inquire into the biological parentage of children, at least during their early years. Because this Welfare and Institutions Code section 300 proceeding was, in part, an action to establish an order for custody of J.L., Christopher was entitled to seek a paternity test and move to set aside Adrian's voluntary declaration of paternity under section 7575, subdivision (b)(3)(A).
While our conclusion that Christopher's challenge was authorized by section 7575 is sufficient to answer Adrian's argument, there is a second and equally fundamental basis for rejecting his contention that Christopher was statutorily precluded from seeking to set aside the voluntary declaration of paternity. Under Kelsey S., Christopher had a constitutional right to contest Adrian's declaration. Any statute that precluded his exercise of this constitutional right was required to yield.
*35 Kelsey S. was a challenge to the adoption of a newborn child of an unwed mother, which was filed by the child's biological father within two days after the baby's birth. (Kelsey S., supra, 1 Cal.4th at pp. 821-822, 4 Cal.Rptr.2d 615, 823 P.2d 1216.) In analyzing the biological father's rights, the Supreme Court began by observing that the Act precludes an unwed biological father from achieving presumed father status unless he is able to satisfy section 7611, subdivision (d) by taking the child into his home and holding it out as his own. (Kelsey S., at p. 825, 4 Cal.Rptr.2d 615, 823 P.2d 1216.) As a result of this statutory structure, the mother of such a child can deny presumed father status to the biological father by giving the baby up for adoption, thereby preventing the father from satisfying subdivision (d). (Kelsey S., at p. 845, 4 Cal.Rptr.2d 615, 823 P.2d 1216.) After extensive discussion, the court concluded that this feature of the Act was irrational for two reasons. First, a good potential father could be denied parental rights by the unilateral decision of the mother, while an unfit mother could have her rights terminated only by statutory procedures. Second, the mother could deny "a model [biological] father" presumed father status while permitting another man "of dubious ability and intent" to achieve presumed father status merely by allowing him to live with the child in her home for a brief period. (Id. at pp. 847-848, 4 Cal.Rptr.2d 615, 823 P.2d 1216.) Accordingly, the court held that, notwithstanding section 7611, "[i]f an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilitiesemotional, financial, and otherwisehis federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (Kelsey S., at p. 849, 4 Cal.Rptr.2d 615, 823 P.2d 1216.)
The court emphasized that its decision applied only in narrow circumstances, when "an unwed father ... has sufficiently and timely demonstrated a full commitment to his parental responsibilities." (Kelsey S., supra, 1 Cal.4th at p. 849, 4 Cal.Rptr.2d 615, 823 P.2d 1216.) In deciding whether a particular biological father qualifies, the court instructed juvenile courts to consider "all factors relevant to that determination. The father's conduct both before and after the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate `a willingness himself to assume full custody of the childnot merely to block adoption by others.' [Citation.] A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (Ibid., fn. omitted.)
Although section 7611 makes no provision for a Kelsey S. father in its list of presumptions, a father asserting valid Kelsey S. rights may effectively qualify for presumed father status as the result of his constitutional right to parent, which overrides any contrary statutory direction. Christopher was an unwed biological father who had never taken J.L. into his home, and therefore was not entitled to presumed father status under section 7611, but he could have claimed effective presumed father status by asserting Kelsey S. rights. Although the juvenile court did not mention Kelsey S., there could have been no other basis for its conclusion that Christopher qualified as a presumed father.
*36 The implicit decision that Christopher was a Kelsey S. father is supported by substantial evidence.[5] Christopher testified that he attempted to assert his paternity early in Mother's pregnancy, but she consistently and falsely refused to recognize those claims, telling him he was not the child's father. When she finally, and for the first time, acknowledged to Christopher that he was the father in June 2006, Christopher rushed to assert his paternity and seek full custody of J.L. in the juvenile court. Before the birth, Christopher appears to have "attempted] to assume his parental responsibilities as fully as the mother will allow." (Kelsey S., supra, 1 Cal.4th at p. 849, 4 Cal.Rptr.2d 615, 823 P.2d 1216.) Mother simply did not allow any assumption of those responsibilities earlier.
While it is true, as Adrian argues, that Christopher did not pay for the birth or bring an action to establish paternity, Christopher refrained from asserting his rights because Adrian actively and violently coerced him into abandoning them. As Christopher told the court in July, "I had actually heard I was [the] father before. I tried to do something about it andAdrian had come to my work and threatened me. Actually, I filed a police report on it. At that point, I just kind of backed away because I didn't really know what to do, and I kind of moved away." Later, in a declaration, Christopher's attorney elaborated: "While [Mother] was pregnant and after the baby was born, both [Mother] and [Adrian] repeatedly told [Christopher] that [he] was not the father. [Adrian] came to Christopher's place of employment and warned Christopher to stay away from [Mother] and the baby when it was born. Adrian disrupted the business and the police were called. After the baby was born, Adrian continued to harass Christopher, threatening to `beat his ass', driving by and throwing things out the car window, and on one occasion hitting the window where Christopher was living with a baseball bat. Adrian's actions were a primary reason that Christopher decided to move out of state."
On these facts, Adrian is estopped from arguing that Christopher should be barred from asserting Kelsey S. rights because Christopher did not immediately attempt to assert his status as father. It was Adrian's own threats and violence that discouraged Christopher from asserting his rights. As Justice Mosk noted in a concurring and dissenting opinion in Kelsey S., conduct that frustrates a biological father from acting as a father presents "paradigm circumstances for the imposition of an estoppel. As Witkin observes, an estoppel deprives a defendant of her defense because of her own objectionable conduct. (3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 523, p. 550.) Evidence Code section 623 also refers to estoppel by conduct. [¶] Generally speaking, equitable estoppel is a rule of fundamental fairness by which a party is precluded from benefiting from conduct designed to prevent determination of the truth and a resolution based thereon.
*37 While often applied in commercial transactions, equitable estoppel has also been invoked in domestic relations cases. [Citations.]" (Kelsey S., supra, 1 Cal.4th at p. 853, 4 Cal.Rptr.2d 615, 823 P.2d 1216 (conc. & dis. opn. of Mosk, J.).)
From the evidence provided, the juvenile court could have concluded that Adrian's wrongful conduct was the primary reason that Christopher did not immediately assert his parental rights with respect to J.L. But for Adrian's threats, it appears that Christopher would have acknowledged paternity and acted fully as a father from the time of J.L.'s birth, as required by Kelsey S. Yet even without the application of estoppel, the court could have concluded that Christopher was discouraged from earlier assertion of his rights by Mother's consistent denials and that he asserted his rights and sought full custody of J.L. as soon as Mother acknowledged he was J.L.'s true father. (See Adoption of Michael H. (1995) 10 Cal.4th 1043, 1060, 43 Cal.Rptr.2d 445, 898 P.2d 891 [man cannot assert Kelsey S. rights unless he has come forward shortly after learning that the mother was pregnant with "his" child].)
A comparable case is Gabriel P. v. Suedi D., supra, 141 Cal.App.4th 850, 46 Cal. Rptr.3d 437, which featured two potential biological fathers, Gabriel and Anthony, both of whom had been told by the child's mother that they were the father. (Id. at pp. 854-855, 46 Cal.Rptr.3d 437.) Around the time of the child's birth, Anthony began living with the mother and executed a voluntary declaration of paternity. When Gabriel appeared at the hospital after the birth, the mother refused to see him or allow him to see the child, and she persisted in this refusal during the child's first few months. When the child was three months old, the mother falsely told Gabriel biological tests had shown he was not the father. (Id. at p. 855, 46 Cal.Rptr.3d 437.) Eventually, however, Gabriel became suspicious and filed a paternity action. After genetic testing confirmed that he was the child's father, the trial court concluded that Gabriel was a Kelsey S. father, although he did not meet the criteria for a presumed father, and set aside Anthony's declaration of paternity. (Gabriel P. v. Suedi D., at p. 856, 46 Cal.Rptr.3d 437.)
The court of appeal agreed that Gabriel should be afforded presumed father status. (Gabriel P. v. Suedi D., supra, 141 Cal. App.4th at p. 856, 46 Cal.Rptr.3d 437.) The court accepted the trial court's conclusion that Gabriel met the requirements of Kelsey S. because he "had acted as promptly as was reasonably possible to establish that he is [the child's] father, and that [the mother's] conduct had unilaterally precluded Gabriel from meeting the statutory requirements for the status of presumed father." (Id. at p. 860, 46 Cal. Rptr.3d 437.) Based on Gabriel's status as a Kelsey S. father, the court rejected the claim that Gabriel lacked standing to file a paternity action because the governing statute restricts standing to the child, its mother, and a presumed father, concluding that Gabriel's constitutional right to assert his Kelsey S. paternity overcame any statutory restriction. (Gabriel P. v. Suedi D., at p. 860, 46 Cal.Rptr.3d 437.) In the same way, any claim that section 7575 did not permit Christopher standing to assert his constitutional paternity rights must fail here.
*38 B.-F.[**]

*42 III. DISPOSITION
The judgment of the juvenile court is affirmed.
We concur: MARCHIANO, P.J., and SWAGER, J.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B. through II.F.
[1] Christopher told the Agency he had lived with Mother until she was six months pregnant with J.L., but Mother denied this.
[2] At this point in the proceedings, the only clue in the record to the existence of Adrian's voluntary declaration was a statement in Mother's application for a restraining order, a copy of which was attached to the Agency's petition. Adrian's naming was not mentioned in the body of the Agency's petition.
[3] All further statutory references are to the Family Code unless otherwise indicated.
[4] Because Christopher M. did not specify the nature of the "limited exceptions" it recognized, it is not clear whether the decision would actually deny standing to Christopher in these circumstances.
[5] The Supreme Court has not articulated a standard of review for decisions awarding Kelsey S. father status. Although we apply the substantial evidence standard of review, we would also conclude that Christopher was entitled to Kelsey S. status under a de novo review.
[**] See footnote *, ante.