Filed 8/17/23  In re Charlotte F. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| IN RE CHARLOTTE F., et al., <br><br> Persons Coming Under the Juvenile Court Law. | 2d Juv. No.B324971 <br> (Super. Ct. No. 21JV00330, 21JV00331) <br> (Santa Barbara County) |
| SANTA BARBARA COUNTY DEPARTMENT OF SOCIAL SERVICES, <br><br>   Plaintiff and Respondent, <br><br> v. <br><br> CHRISTOPHER A., <br><br>   Defendant and Appellant. | |

Christopher A. (father) appeals the orders of the juvenile court denying his request for reunification services and terminating his parental rights.  (Welf. & Inst. Code, §§ 388,

366.26.[1]) He also contends the juvenile court erred by finding the Indian Child Welfare Act (ICWA; 25 U.S.C.S. § 1901 et seq., § 224.2) does not apply. We affirm.

## FACTS[2]

Father and Jessica G. (mother)[3] are the biological parents of twins Charlotte F. and Charles F., who were born in September 2021. In January 2021, the mother called father asking for his help because she was living on the street. Father drove to mother's location, got her some food, and took her to a motel where they had unprotected sex. The next day he took her to another motel and they again had sex. He left after the second night at mother's request and had no further contact with her until December 2021.

On December 14, 2021, father used Facebook to send a message to mother asking how she was doing. She responded immediately in a message: "Well I don't know, I think we made twins." She sent him pictures of the twins and told him their first names. He asked to see them but she did not respond to his request. She then blocked him on Facebook. After making some efforts to locate the mother by asking his family members, he hired a law firm in May 2023 to assist him. When the firm told him they could not help, at the firms' suggestion, he called CWS and discovered the twins were in their custody and had been removed from mother at birth.

---

[1] All statutory references contained herein are to the Welfare and Institutions Code unless otherwise indicated.

[2] Facts relevant to ICWA are discussed under the "ICWA" heading, post.

[3] Mother is not a party to this appeal.

The twins were born in September 2021 and were immediately admitted to the Neonatal Intensive Care Unit due to their prematurity and exposure to perinatal substance abuse. Mother had admitted using methamphetamine and methadone during her pregnancy and had been testing positive for methamphetamine almost weekly since January 2021. After being discharged from the hospital the twins were placed in a confidential resource family home. Both had significant health issues.

The mother reported to CWS and the juvenile court that the only possible father of the children was her husband, Scottie F. However, in late October shortly after the initial detention hearing she told a social worker that she may have had sex with a man named "Christopher [Al]."[4] but was not sure that was his last name, and she thought he might be the twins' father. She did not have any more information about him, or how to contact him except she said he was her "previous partner's" cousin.[5]

In November 2021 the juvenile court sustained petitions filed under section 300, declared the children dependents, and offered mother reunification services. Scottie F. did not deny he could be the father but had doubts and requested paternity testing.

In late March 2022, paternity test results revealed Scottie F. was not the twins' biological father. On April 28, 2022, the court dismissed Scottie F. from the case.

---

[4] The last name she gave is not the same as father's last name.

[5] Mother had three older children by two different men.

At the six-month review hearing on May 3, 2022, mother's whereabouts were unknown. Mother's last contact with the social worker had been on March 28, 2022, when she reported staying at a shelter but was possibly going to be leaving. The juvenile court terminated reunification services for mother and set a section 366.26 permanency planning hearing for August 30, 2022.

After father contacted CWS in July, CWS set a hearing at which the juvenile court appointed him counsel and ordered a paternity test. When paternity test results revealed father was the twins' biological father, he filed a request under section 388 to be found the children's presumed or *Kelsey S.*[6] father, to receive visits with the children, and to be offered reunification services.

A hearing on father's section 388 request was set on the same date as the continued section 366.26 hearing. After receiving evidence and argument the juvenile court denied father's request, finding even if he was a *Kelsey S.* father it would not be in the children's best interest to offer him services. The court ordered adoption as the children's permanent plan and terminated the parents' rights.

DISCUSSION

*Notice*

Father argues his constitutional due process rights were violated because he was not given adequate notice of the proceedings. He contends CWS knew in October 2021 that he might be the children's biological father yet made no effort to locate him. He requests that we remand and instruct the juvenile court to hold a new jurisdiction and disposition hearing

---

[6] *Adoption of Kelsey S.* (1992) 1 Cal.4th 816.

4

"and address placement of the children with [him] or the grant of reunification services."

We conclude father forfeited his claim by failing to object below. Father made his first appearance in July 2022, he was appointed counsel, filed a request to change the court's orders, participated in an evidentiary hearing and never objected on the basis of inadequate notice. "[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. omitted.) "A parent's failure to raise an issue in the juvenile court prevents him or her from presenting the issue to the appellate court." (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 582.)

Although we have discretion to excuse a party's failure to properly raise an issue in a timely fashion (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6), in dependency proceedings that discretion "'should be exercised rarely and only in cases presenting an important legal issue.'" (*In re Wilford J.* (2005) 131 Cal.App.4th 742, 754.) "This is especially true in juvenile dependency cases, which involve the well-being of children and in which 'considerations such as permanency and stability are of paramount importance.'" (*In re T.G.* (2015) 242 Cal.App.4th 976, 984 quoting *In re S.B.* (2004) 32 Cal.4th 1287, 1293.)

When a parent has declined the opportunity to claim a lack of notice below, "appellate courts routinely refuse to exercise their limited discretion to consider the matter on appeal. This is precisely because defective notice and the consequences flowing from it may easily be corrected if promptly raised in the juvenile

5

court." (*Ibid.*)  By failing to assert an objection to inadequate notice in the juvenile court, father forfeited this claim on appeal.

Even if we were to consider his claim however, we would conclude there was no error.  Father contends CWS was obligated to attempt to locate him and provide notice once mother disclosed there might be another father besides her husband.

Early in the case, mother reported she "may have had sex" while under the influence of alcohol with man named "Christopher Al." and that he might be the father but she was unsure of his last name.  She also said "Christopher Al." was her "previous partner's cousin" without specifying who that "previous partner" was.  She did not have any other information to help identify or locate him.  After providing this information the mother never again appeared in court and had limited contact with CWS.  She effectively disappeared.  At this same time, Scottie F. had already been identified as a possible father and because he was mother's husband he was initially treated by the juvenile court as a presumed father.  (See Fam. Code, § 7611, subd. (a).)  Scottie F. did not deny he could be the father but requested paternity testing.  "Once a presumed father has been identified, the social services agency is not expected to wait for other potential fathers to come forward." (*In re Julia U.* (1998) 64 Cal.App.4th 532, 542, citing *In re Zacharia D.* (1993) 6 Cal.4th 435, 453 (*Zacharia D.*).)  The results of that testing were not known until late March 2022 but by then the mother's whereabouts were unknown and she had not provided any additional information that would assist in identifying or locating "Christopher Al."

On these facts, we disagree further investigation was required regarding "Christopher Al."

6

*Section 388 Request to Change Court Order*

Father contends "there is no doubt [he] has proven himself to be a *Kelsey S.* quasi-presumed father" and therefore he was entitled to reunification services. The juvenile court found regardless whether he was a *Kelsey S.* father it would not be in the children's best interest to offer him visits or reunification services.

Under the dependency statutes, presumed fathers have far greater rights than biological fathers. (*Zachariah D., supra*, 6 Cal.4th at pp. 448-449; *In re J.L.* (2008) 159 Cal.App.4th 1010, 1018.) Only a presumed father is entitled to reunification services under section 361.5. (*Zachariah D.*, at p. 451.)

If a man is not legally married to the mother he can establish his presumed father status by receiving the child into his home and openly holding the child out as his own. (Fam. Code, § 7611, subd. (d).) If he is prevented from doing so, he may still be entitled to services as a *Kelsey S.* father[7] by demonstrating he made a full commitment to his parental responsibilities but only if reunification services have not yet been terminated and a section 366.26 hearing has not yet been scheduled. (*In re Julia U.* (1998) 64 Cal.App.4th 532, 540-541.) Once reunification services are terminated, a man who has not achieved presumed father status has only one remedy, "to file a motion to modify under section 388." (*Zacharia D., supra*, 6 Cal.4th at p. 453.)

---

[7] The term "*Kelsey S.*" father applies to a man who is the child's biological father and made a full commitment to fulfill parental responsibility at the earliest possible point but was thwarted from fulfilling that commitment by the other parent or a third party. (*Adoption of Kelsey S., supra*, 1 Cal.4th at p. 849.)

Section 388 provides in relevant part that "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made . . . . [¶¶¶] If it appears that *the best interests of the child . . .* may be promoted by the proposed change of order . . . [or] termination of jurisdiction, . . . the court shall order that a hearing be held and [notice given] . . . ." (Italics added.)

Father argues he was not required to demonstrate that offering him services would be in the twins' best interest because as a *Kelsey S.* father he was entitled to services, regardless. As stated, our Supreme Court has held otherwise. (*See also, In re Vincent M.* (2008) 161 Cal.App.4th 943, 947 ["As a biological father who did not assert paternity until the case was in permanency planning, [appellant's] 'only remedy' was to show, under section 388, that [the minor's] best interest required vacating the permanency planning orders and providing [appellant] reunification services so that he might qualify as a presumed father, entitled to custody."].)

Here, the juvenile court found it could not "come close to making a finding that [father's] requested change would be in the best interest of the children." "[T]hese children are fragile, emotionally and physically; . . . they are very young children . . . any disruption in their routine, or even such a simple matter as a change in placement, would not only not be in their best interest, but detrimental to their physical and emotional well-being." Father did not dispute this finding on appeal and the juvenile court's finding was supported by substantial evidence.

Finally, although the juvenile court did not expressly determine whether father qualified as a *Kelsey S.* father, it did consider the "totality of the evidence" in denying his section 388 request. Specifically, the juvenile court considered whether father had demonstrated he had made a full commitment to his parental responsibilities by making diligent efforts to locate mother and the children after he and mother communicated in December 2021. The juvenile court found father's efforts, which consisted of talking to his mother, his aunt and his uncle, and four months later hiring a law firm, were "not the strongest" and "feeble at best."[8]

"While under normal circumstances a father may wait months or years before inquiring into the existence of any children that may have resulted from his sexual encounters with a woman, a child in the dependency system requires a more time-critical response. Once a child is placed in that system, the father's failure to ascertain the child's existence and develop a parental relationship with that child must necessarily occur at the risk of ultimately losing any 'opportunity to develop that biological connection into a full and enduring relationship.'" (*Zacharia D.*, *supra*, 6 Cal.4th at p. 452 quoting *Kelsey S.*, *supra*, 1 Cal.4th at p. 838.)

A section 388 request is addressed to the juvenile court's discretion, and its ruling will not be disturbed on appeal absent a showing of a clear abuse of discretion. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.) We conclude the juvenile court did not err in denying father's section 388 request.

---

[8] We also note he offered no evidence to explain why he took no action whatsoever to determine whether his unprotected sexual relations with mother resulted in her pregnancy.

*ICWA*

Father contends remand is required because the juvenile court failed to "do any investigation about [his] possible Native American heritage" when no one questioned his mother, uncle or aunt or any other paternal relatives.  We disagree.

We generally review ICWA findings for substantial evidence.  (*In re J.K.* (2022) 83 Cal.App.5th 498, 504.)  "Because the material facts at issue are undisputed, ""we review independently whether ICWA requirements have been satisfied."""  (*Ibid.*)  "We must uphold the [juvenile] court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance."  (*In re A.M.* (2020) 47 Cal.App.5th 303, 314.)

ICWA defines an "'Indian child'"[9] as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."  (25 U.S.C.S. § 1903(4) & (8); § 224.1, subd. (a).)  The juvenile court and county welfare department have an affirmative and continuing duty to inquire whether a child subject to dependency proceedings is or may be an Indian child.  (§ 224.2, subd. (a); Cal. Rules of Court, rules 5.481(a) & 5.668(c).)

The duty to inquire begins with the initial contact and obligates the juvenile court and the child services agency to ask the child, parents, extended family members, and others who

---

[9] Since "ICWA uses the term 'Indian,'" much of the case law does so as well "for consistency, even though" the authors of those decisions "recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many."  (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

have an interest in the child, whether the child is, or may be, an Indian child. (§ 224.2, subds. (a)-(c).)

Here, the juvenile court asked father if he had any Native American Indian heritage in his family. Father responded he had a "23andMe DNA test" that showed "61 percent . . . Indian." He added, "It said it was from Mexico mainly." He said he had no other reason to believe he had any Native American Indian heritage and he did not know if any member of his family was a registered member of a tribe. The court did not make any ICWA finding.

CWS later questioned father regarding ICWA. He reported again his only basis for believing he had possible Native American Indian ancestry was the results of a 23 & Me test, but that no family members were registered members of any tribes, that his entire family is from Mexico and "there is no Native American ancestry in connection to a USA tribe." Father added that the 23 & Me results "stated that he has ancestry in Jalisco and Michoacán." CWS reported this information to the court including that father "did not provide additional relative contact information since his maternal and paternal family are from Mexico." After receiving this information at the section 366.26 hearing the juvenile court found the ICWA did not apply.

We do not agree CWS was obligated attempt to identify and locate father's paternal relatives, especially in light of the information father provided. "Where . . . a parent largely fails . . . to provide names and contact information for extended family members, [CWS's] ability to conduct an exhaustive ICWA inquiry necessarily is constrained." (*In re Q.M.* (2022) 79 Cal.App.5th 1068, 1082, interpreting § 224.2, subd. (b).) "[W]e cannot ask [CWS] to intuit the names of unidentified family members or to

11

interview individuals for whom no contact information has been provided." (*Ibid.*)  As such, information from unknown paternal relatives with whom CWS never had contact was not "readily obtainable."  (*In re Benjamin M.*, *supra*, 70 Cal.App.5th at p. 739.)  We find there was substantial evidence supporting the juvenile court's finding that ICWA did not apply.

DISPOSITION

The judgment (order terminating parental rights) is affirmed.

NOT TO BE PUBLISHED.


CODY, J.

We concur:


GILBERT, P. J.


YEGAN, J.

12

Gustavo Lavayen, Judge
Superior Court County of Santa Barbara
_____

Nancy R. Brucker, under appointment by the Court of Appeal, for Defendant and Appellant.

Rachel Van Mullem, County Counsel and Lisa A. Rothstein, Senior Deputy, for Plaintiff and Respondent.