Filed 3/12/14  In re A.H. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re A.H., a Person Coming Under the Juvenile Court Law | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, <br><br>     Petitioner and Respondent, <br><br> v. <br><br> AR. H., <br><br>     Objector and Appellant. | A137622 <br><br> (Alameda County Super. Ct. No. OJ0911755) |

Ar. H. (father) appeals from the juvenile court's order terminating his parental rights and its prior denial of his petition pursuant to Welfare and Institutions Code section 388[1] for modification of its previous orders, both regarding his biological daughter, A.H. Father argues the juvenile court repeatedly violated his constitutional right to due process in the underlying dependency proceedings and, shortly before terminating his parental rights, wrongly denied him the status of a natural father with reunification services pursuant to *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*).

The mother of A.H. joins in father's appellate claims and argues that, if we reverse the juvenile court's order terminating father's parental rights, we must afford her the same

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

relief. Respondent Alameda County Social Services Agency (Agency) opposes all claims. We affirm the juvenile court's rulings in their entirety.

## BACKGROUND

We summarize the facts and procedural history relevant to this appeal.

### *The Agency's Section 300 and 387 Supplemental Petitions*

In January 2009, the Agency filed a section 300 petition in Alameda County Superior Court seeking to make A.H., then an 18-month-old girl, a dependent of the court. The petition, as subsequently amended, alleged that mother, a dependent minor of the court herself, had demonstrated a pattern of behavior that placed A.H. at risk for harm or neglect, and that father was incarcerated and unable to provide care for the child.

The Agency subsequently reported to the juvenile court that mother was 17 years old, a long-time dependent of the court, and not married to father. She was constantly "AWOL" from her placements, without an adequate support system or resources to care for A.H. without Agency help, had "exhibited out-of-control behavior," threatened to go AWOL with A.H., and was seen treating A.H. roughly, all resulting in the determination that the child should be placed in protective custody. Mother said she had been a victim of domestic violence by father, had not seen or talked to him for a long time, and did not have contact information for him. A woman identifying herself as his mother had tried to contact the child welfare worker.

Mother submitted to the allegations. At a February 2009 disposition hearing, she testified father, absent from the proceedings, was A.H.'s father, but had not signed her birth certificate (also testifying, inaccurately, that his name was on the birth certificate, and there was no other possible father. The court found father to be an alleged father and appointed counsel for him, sustained the petition, and placed A.H. in mother's home under the Agency's supervision. As we will discuss, in May 2009, the court, after hearing father's testimony, again concluded he was an alleged father; thereafter, father personally had little contact with the Agency, A.H., or the court until 2012.

In May 2010, the Agency filed a section 387 supplemental petition alleging A.H. should be placed in foster care because of mother's lack of care and dangerous behaviors,

2

which included leaving A.H. with a relative without provision for her support or information about mother's whereabouts and being arrested in 2009 for battery on a spouse or cohabitant. In July 2010, the court found the petition allegations to be true, removed the minor from mother's care and confirmed A.H.'s placement in foster care, granted mother reunification services and visitation, and ruled the Agency was not required to provide reunification to the alleged father.

The court extended reunification services for mother in January 2011 and May 2011. In August 2011, the Agency reported mother had unstable housing, had not begun parenting classes, and repeatedly missed visits with A.H. It recommended reunification services to mother be terminated and a section 366.26 hearing be scheduled to set a permanency plan for A.H.

After mother resumed visits with A.H. in October 2011, a psychologist, Christina Dughman, reported A.H., having not seen nor heard from her mother for three months, displayed significant signs of stress and anxiety with mother, to which mother did not respond well. Dughman diagnosed A.H. as having anxiety disorder. She concluded, "Resolution of placement is in [A.H.'s] best interest, and with urgency given her age, as it is critical to her emotional development, her personality development, her intellectual functioning, and her relationship capacity. Because of her trauma history, [A.H.] is at greater risk for symptoms to re-emerge and/or exacerbate when future separations are experienced; it is imperative that she be in a stable permanent placement so that she may attach and develop a secure relationship to her caregivers without the fear of another rupture and separation."

Mother filed a section 388 petition in January 2012, which the court denied. In February 2012, the court terminated mother's reunification services and scheduled a section 366.26 hearing. Thereafter, the Agency recommended termination of parental rights and adoption as a permanent plan.

### *Father's Participation in the Proceedings*

Early in the proceedings, the Agency reported father had said he wanted to take a paternity test and visit with A.H., but had difficulty locating mother. Father attended a

May 2009 interim review hearing with his counsel, who asked the court to declare father A.H.'s presumed father with visitation rights and order a paternity test.

Father's counsel asserted the Agency should pay for the test because "we think [father] will be the presumed father before we finish today," and "under these circumstances, the Agency generally pays for them." The court responded, "if the father wants to be a father, then he pays for the paternity test." Mother's counsel asserted father would be billed for the test if he were determined to be the biological father, but not otherwise.

Mother's counsel also objected to the court conducting a paternity inquiry before the father had a paternity test, and the court agreed. Father's counsel then responded, "[Father's] *not questioning his paternity*. We'll just proceed with the presumed father at this point." (Italics added.)

The court then held a paternity inquiry. Father testified that A.H. was his child. He said he had lived with mother during the conception period and for almost a year before that, but not after conception. Mother had told him he was the father, and he was not aware that she had had other sexual partners during the conception period. During mother's pregnancy, he had claimed the baby as his own to friends and family and had bought a few things for A.H. before her birth. He had not signed any paperwork at the hospital acknowledging paternity, and his name was not on A.H.'s birth certificate, nor did he provide any regular support for her. The court ruled he was an alleged father. Father's counsel asked if the court would order that A.H. be made available for testing; mother's counsel indicated that father could contact the Division of Child Support, which would make the appropriate arrangements, and the court indicated it would leave it on that basis. Father's counsel agreed to this arrangement. The court then said father was "welcome" to pursue a paternity test, and "not entitled at this time to reunification services, if that becomes an issue," but that he could have appropriate visitation.

In June 2009, father had an initial visit with A.H., who cried throughout the visit. A therapeutic visit was arranged, but father cancelled it. After that, he did not contact the

4

Agency nor attend any court hearing (although his counsel did) for approximately a year and a half.

For the six-month review hearing in December 2010, the Agency reported father had told the caseworker he was unemployed and serving a three-year probation period for a conviction involving a firearm and marijuana possession. He said he was "somewhat certain" A.H. was his daughter, but wanted a paternity test to be sure. Nonetheless, he had not pursued a paternity test, although his case plan called for him to establish paternity.

At the December 2010 hearing, father's counsel asked the court if it would order the Agency to provide a paternity test. The court said it understood that father could take the test without paying upfront regardless of the result, but would have to pay if he was found to be the biological father, and ordered father to have the test.

In early January 2011, father visited A.H. with mother at the Agency office. Later that month, he attended a hearing with counsel and was granted visitation as frequently as possible consistent with A.H.'s well-being. Father did not visit A.H. again or personally attend another court hearing until a year and a half later, when he appeared in court in July 2012.

In June 2012, the Agency reported that paternity test results it received in March 2012 indicated father was A.H.'s biological father. Father had not been required to pay for the test. The Agency had not been able to locate father until April 2012, when he contacted it to say he was in the hospital recovering from being shot.[2]

As we have indicated, in February 2012, the court terminated mother's reunification services and scheduled a section 366.26 hearing. In July 2012, at the beginning of that hearing, father's counsel, with father in attendance, requested reunification services for father, which counsel for the Agency, A.H., and mother opposed. Father's counsel, explaining why father had only recently learned he was the biological father and not sought visitations with A.H., contended, "[h]e did not think that

_____

[2] Father's counsel later represented to the court that father had been the victim of a robbery attempt.

5

he was the father. He thought that any rumors about it or any comments by the mom was simply complaining or playing games, so he . . . did not feel that he was, but he did have doubts over the last couple of years and decided that he wanted to find out once and for all if he was." Counsel added, "Now that he knows that he is the biological and also the fact that mom has not been reunified, he feels that he would like a chance to reunify with the child rather than going along with the adoption." He asked that father be given six months of reunification services.

Father himself said, "I was not sure that I was the father, so that leveled me up and down on the whole situation." He said he had not seen A.H. before she was taken from mother because he did not know where mother was located, and was not pursuing being the father at that time.

Father's counsel also asserted father had not learned he was the biological father until recently because he had been unable to afford the paternity test. When the court noted father had been involved in the proceedings for over three years before seeking reunification services, counsel said father "tried early on to get the blood test, but the court refused to order the county to pay for it, and he couldn't afford it. At that point he did not know whether or not he was the dad. Its only since—finally, he was given the blood test, and he's now certain that now he feels a commitment to his daughter."

Father's counsel requested a paternity inquiry hearing. After telling counsel he was welcome to conduct such an inquiry, the court checked the record and found it had already conducted inquiries in February and May 2009. Based on them, it ruled that father was not entitled to reunification services. The court then confirmed with father that, similar to what the Agency had reported, his concern about A.H.'s adoption was that his "relatives were being considered for adoption" of A.H.

The court directed the Agency to determine with the therapist if father and his mother could visit A.H., and continued the section 366.26 hearing to October 2012.

### *Events Leading Up to Father's Section 388 Petition*

For the October 2012 hearing, the Agency reported mother had canceled six visits with A.H. since June 2012, father opposed adoption and wanted A.H. placed with one of

6

his relatives, and the therapist recommended father not visit with A.H. because of A.H.'s past trauma. The court ordered the Agency to review the visitation issue and provide documentation of the therapist's recommendation, and continued the section 366.26 hearing.

Christina Dughman, the therapist, wrote in a November 7, 2012 letter to the Agency that A.H.'s emotional difficulties continued, exacerbated by previous poor foster care and mother's recently missed visits. The current foster mother was providing a safe, loving, and nurturing home for her, and they were increasingly bonding. Permanency was critical for A.H.'s development, particularly in light of her past trauma. Dughman recommended that A.H. have the chance to develop trust and security with her foster mother before it was determined whether to allow visitations with new family members or future contact with mother.

At a November 26, 2012 hearing, the court denied another section 388 petition by mother and continued the section 366.26 hearing until the following day. The next day, November 27, mother and father appeared with counsel and the section 366.26 hearing proceeded. The Agency's last three reports, including Dughman's November 7 letter, were admitted into evidence. Testimony was also given by the caseworker, mother, and father. The court continued the hearing until November 30 to hear argument. Two days later, father filed a section 388 petition, seeking a change in the court's previous orders because of changed circumstances and new evidence.

### *Father's Section 388 Petition*

In his section 388 petition, father identified the previous court orders he wanted modified as that he was "an alleged father and was not granted Reunification services . . . ." As to what had changed, he stated, "Father was proven to be the biological father of the minor, he has a stable living situation, has never been adjudged in these proceedings to be an unfit father, lived with the minor and the mother for several months from the time of her birth, held the child out to the community as his child." He also cited testimony given at the November 27 hearing. This included that mother said he was a "great father" when the three had lived together and "relentless" in trying to visit

7

A.H., and that mother had hid the child from him, as well as the caseworker's testimony that father was "sincere" in trying to establish a relationship with A.H., and regularly visited and supported two other biological children. Father's counsel contended there were "several holes in the narrative" that could only be closed by having a hearing to determine whether there were other relevant facts. He also asserted it was in A.H.'s best interests "to have a relationship with her father," without further elaboration. Father asked the court to declare him a "natural father" with rights consistent with those established in *Kelsey S.*, *supra*, 1 Cal.4th 816, and provide him reunification services and visitation rights. He also requested an evidentiary hearing as necessary.

At the continued section 366.26 hearing on November 30, the court referred to father's section 388 petition and the court's duty to determine whether the petition established a prima facie case that merited an evidentiary hearing. It asked if counsel wanted to argue whether a hearing was necessary, and father's counsel indicated that he did. After hearing argument from him and the other counsel, the court took the matter under submission and scheduled a hearing on December 27, 2012 to announce its decision.

On December 20, Dughman wrote an update letter to the Agency after meeting with mother. Dughman reported that mother had an increased awareness of A.H.'s experience, but A.H. was not ready to reengage with her. A.H. had become "extremely distressed" and experienced a setback in her healing process after it was gently suggested in therapy that she see mother, becoming afraid she would have to leave her foster mother if she saw mother. Due to her past trauma and the delay in establishing permanency, A.H. was "continuously questioning her self-worth, lovability, and her place in the world," and felt unwanted by the important adults in her life. Seeing mother would likely exacerbate her symptoms. Meeting father, a stranger to A.H., "would be confusing and scary" and would "likely prompt [A.H.] to think she will have to once again be separated from her primary caregiver." Dughman maintained her recommendation against visitations, either with mother, or any new adult figure, including father.

At the December 27 hearing, the court invited additional argument regarding father's section 388 petition, and all counsel participated. Dughman's December 20, 2012 update was admitted into evidence, both for the purposes of the section 366.26 hearing and consideration of whether to hold a hearing on father's section 388 petition, and her November 7, 2012 letter was also in evidence. After the matter was submitted, the court denied the section 388 petition without holding a hearing. It found there was not a change of circumstances and father did not qualify as a *Kelsey S.* father. Even if there were a change of circumstances, the court did not think it was in A.H.'s best interests to have a new adult figure introduced into her life, based on Dughman's reports.

The court then heard argument about the Agency's proposed termination of parental rights. It subsequently ordered that mother's and father's parental rights were terminated. The court recognized that father joined in mother's position, which was that guardianship was the appropriate plan, but did not allow his counsel to argue because father was a "mere biological father."

Both father and mother filed timely notices of appeal challenging the court's order terminating their parental rights. We granted father's motion to construe his notice of appeal as encompassing the order denying his section 388 petition, and mother's motion to construe her notice as encompassing the order denying her November 2012 section 388 petition.

## DISCUSSION

### I. *Father's Standing to Appeal*

We first consider the Agency's contention that father does not have standing because, as a biological father, he is not a party aggrieved by the lower court's termination of parental rights. We disagree, based on *In re Baby Boy V.* (2006) 140 Cal.App.4th 1108 (*Baby Boy V.*).

### A. *The Categories of Paternity*

To consider this and father's other appellate claims, we must first distinguish among the statutory categories of paternity. Generally, a father's status determines the rights to which he is entitled in a dependency proceeding.

9

The dependency statutes distinguish among three categories: (1) presumed; (2) biological, or natural; and (3) alleged. (See *In re Zacharia D.* (1993) 6 Cal.4th 435, 449, fn. 15.) A presumed father is a man who marries or attempts to marry the child's mother; executes with the mother a voluntary declaration of paternity; or receives the child into his home and openly holds out the child as his own. (Fam. Code, §§ 7571, 7573, 7611, subds. (a)-(d).) A biological father is one whose paternity of the child has been established, but who has not established that he qualifies as the child's presumed father. An alleged father is a man who may be the father of the child, but who has not established biological paternity or presumed father status. (*In re Zacharia D.*, at pp. 449, fn. 15, 451; *In re J.L.* (2008) 159 Cal.App.4th 1010, 1018.)

"Presumed father status ranks highest." (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801.) Only a presumed father enjoys the panoply of rights set forth by the dependency statutes and a father who is an alleged or a biological father is entitled to fewer rights. (*In re Zacharia D.*, *supra*, 6 Cal.4th at p. 449, fn. 15.) "[O]nly a presumed, not a mere biological, father is a 'parent' entitled to receive reunification services under section 361.5" or seek custody of the child under section 361.2. (*Zacharia D.*, at p. 451, 451.) In contrast, "the juvenile court 'may' order reunification services for a biological father if the court determines that the services will benefit the child." (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596; see also *In re A.A.* (2003) 114 Cal.App.4th 771, 779-780.)

**B. *Baby Boy V.***

In *Baby Boy V.*, our colleagues in Division One of this court considered whether an alleged father who first appeared in the proceedings at a section 366.26 hearing to ask for a paternity test, which was not ordered by the court, and later told the court he wanted to provide for and have a relationship with the child, had standing to appeal the court's order terminating his parental rights. (*Baby Boy V.*, *supra*, 140 Cal.App.4th at pp. 1112, 1116-1117.) The appellate court decided he did have standing.

The *Baby Boy V.* court rejected the social services agency's argument that the alleged father did not have standing, since he had appeared "at the earliest practical point

10

and attempted to join the proceedings as a party," and "any other result would be nonsensical. In *In re Paul H.* (2003) 111 Cal.App.4th 753, 759 . . . , the court explained that an alleged father in a dependency proceeding becomes a party when he ' "appear[s] and assert[s] a position." ' [Citation.] [The alleged father] appeared and asserted a position—that he believed he was the father, wanted to confirm his belief with a paternity test, and wanted to know and support his son. Under these circumstances, he has standing." (*Baby Boy V.*, *supra*, 140 Cal.App.4th at pp. 1116-1117.)

Here, father appeared early in the proceedings, in May 2009, acknowledged paternity, and argued he was entitled to presumed father status. Over the next approximately three years, his participation in the proceedings and A.H.'s life was minimal and sporadic, but his counsel continued to appear at hearings and periodically asserted his interests, making requests regarding visitation and paternity testing. Admittedly, father's position during the proceeding appears to have shifted; by July 2012, he contended that he had not believed he was A.H.'s father before learning the results of the 2012 paternity test. Nonetheless, after confirming his paternity, father sought reunification services from the court, opposed adoption, and sought a change in the court's rulings via his section 388 petition. These were sufficient steps within the proceeding to establish him as an aggrieved party with standing to appeal the court's termination of his parental rights and denial of his section 388 petition, based on *Baby Boy V.*

The Agency argues *Baby Boy V.* is distinguishable on its facts because there, "it was undisputed that the alleged father was a non-offending, stable, employed, and financially responsible adult, and came forward at the earliest possible moment, that the only reason he did not come forward at an earlier date was that he did not know of the existence of the [child]." By contrast, in the present case, father is not a non-offending, stable, employed, and financially responsible adult, knew of the existence of A.H. since mother's pregnancy, appears to have absented himself from A.H.'s birth by choice, was slow to participate in paternity testing for no good reason, and, even after the paternity test showed him to be the biological father, never sought to assume full custody of A.H.

11

A number of the Agency's factual contentions matter in our analysis of the merit of father's appeal, as we will discuss, but they do not establish a lack of standing. Again, father appeared early in the proceedings and subsequently took positions which were adversely affected by the court's termination of his parental rights. This is sufficient to establish standing under *Baby Boy V.*

## II. *The Court's Paternity Determination Pursuant to Section 316.2*

Father first argues the court did not make a full paternity determination as required by section 316.2 because it required father to pay for paternity testing, thereby violating his due process rights. Father has forfeited this claim, invited one of the purported errors he complains of, and his arguments lack merit.

### A. *The Proceedings Below*

According to father, the juvenile court prejudicially violated his due process rights twice, in May 2009, and December 2010. His arguments are based on characterizations of the proceedings that are not supported by the record.

#### 1. *The May 2009 Hearing and Aftermath*

According to father, in May 2009, the court stated he was to pay for the paternity test and, "[a]s a result, the court did not order a paternity test," stating only that father was welcome to pursue one if he wanted. He "requested a judgment of parentage," but "the juvenile court did not take the appropriate steps at that time . . . ." Furthermore, "father was present and willing to accept responsibility [for A.H.] from the outset."

The record does not support these contentions. The transcript of the May 2009 hearing indicates the court did not order paternity testing for a reason unrelated to who would pay for the test. Father's counsel requested that the court both order a paternity test and immediately conduct a paternity inquiry, and did not request a judgment of parentage. Faced with the court's agreement with mother's counsel's objection that the paternity test should be done before the paternity inquiry was conducted, father's counsel dropped his request for a paternity test. He said. "[Father's] *not questioning his paternity*. We'll just proceed with the presumed father at this point." (Italics added.) The court immediately conducted the paternity inquiry and, upon hearing father's

12

testimony, ruled he was an alleged father. Father's counsel asked that A.H. be made available for a test, but did renew his request for an order for the test itself. The court then indicated he was welcome to take a paternity test. Nothing was said at the hearing about whether or not father could afford to pay for the test.

The record also does not indicate that father was willing to accept *full* responsibility for A.H. from the outset. At the May 2009 hearing, father acknowledged paternity, but he also indicated he had not provided support for A.H. since her birth. He neither sought reunification services nor indicated he was willing to provide support for A.H. Instead, he sought only presumed father status and visitation rights. At the end of the hearing, the court ordered that he be allowed appropriate visitation. Father visited A.H. the following month, cancelled the next scheduled visit, and visited her only once more, with mother, over the next approximately three years.

### 2. *December 2010 Hearing*

According to father, at the December 2010 hearing, the court "ordered father to take a paternity testing but specifically ordered that the Agency did *not* have to pay for it." The court did so although it "was aware that father was unemployed at that time and unable to pay for paternity testing."

The record does not support these contentions either. Father refers to the Agency's report that father was unemployed, but identifies nothing that indicates the court was told he could not afford to pay for a paternity test. At the December 2010 hearing, father's counsel asked only if the court would order the Agency to provide a paternity test. The court said it understood that father could take the test without paying in advance regardless of the result, but would have to pay if he was found to be the biological father, and ordered father to have the test. Counsel made no objection to this, and said nothing further. In other words, the court never ruled on whether the Agency should pay for the test in the face of father's inability to pay for it because father never put the issue before the court.

Also, at the May 2009 and December 2010 hearings, it was established that father could take a paternity test under any circumstances. It was stated that he would have to

13

pay only if he was found to be the biological father; in other words, after the fact. Again, father did not object to this procedure.

## B. *Forfeiture*

Before addressing father's arguments, we consider the Agency's argument that father forfeited it by failing to first raise a relevant objection below. We agree.

"As a general rule, a party is precluded from urging on appeal any point not raised in the trial court." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 411-412 (*Riva M.*).) "[N]onjurisdictional issues must be the subject of objection or appropriate motions in the juvenile court; otherwise those arguments have been waived and may not be raised for the first time on appeal." (*In re Christopher B.* (1996) 43 Cal.App.4th 551, 558.) "Any other rule would ' " 'permit a party to play fast and loose with the administration of justice by deliberately standing by without making an objection of which he is aware and thereby permitting the proceedings to go to a conclusion which he may acquiesce in, if favorable, and which he may avoid, if not.' " [Citations.]' " (*Riva M.*, at p. 412.)

"[A]pplication of the forfeiture rule is not automatic. [Citations.] But the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue. [Citations.] Although an appellate court's discretion to consider forfeited claims extends to dependency cases [citations], the discretion must be exercised with special care in such matters." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded in part by statute on other grounds as discussed in *In re S.J.* (2008) 167 Cal.App.4th 953, 962.)

Here, father's argument is not that the juvenile court denied him the opportunity to have a paternity test. It welcomed him to do so in May 2009 (in the absence of a pending request for an order) and *ordered* him to do so in December 2010. Instead, father argues the court's purported requirement that he pay for the test made it impossible for him to do so in light of his indigence. Putting aside for the moment the inaccuracies underlying this contention, father never contended he could not afford to pay for the test until July 2012, after the test was completed and mother's reunification services had been terminated, and more than three years after the May 2009 hearing. At both the May 2009 and December

14

2010 hearings, it was discussed that he would be required to pay after having the test only if he was found to be the biological father. Father made no objection. Under these circumstances, we conclude, contrary to father's assertion, that an important legal question is not at issue, and that father has forfeited his appellate arguments regarding the court's purported failure to make a full paternity determination pursuant to section 316.2.[3]

## C. *Invited Error*

Much of father's appellate claim rests on his contention that the juvenile court at the onset, in May 2009, did not fully determine paternity. We agree with the Agency that any such error was invited.

"[T]the doctrine of invited error applies where a party, for tactical reasons, persuades the trial court to follow a particular procedure. The party is estopped from claiming that the procedure was unlawful." (*In re Jamie R.* (2001) 90 Cal.App.4th 766, 772.) This is exactly what occurred here. At the May 2009 hearing, father's counsel dropped his request for a paternity test in favor of an immediate paternity inquiry by the court, which the court immediately conducted, and during which father acknowledged paternity. Father is estopped now from saying that any statements or actions by the court regarding the paternity test were a violation of his right in light of his counsel's persuading the court to do so.

## D. *The Court Did Not Err*

Father is also incorrect on the merits. The court did not fail in its duty to make the paternity determinations it was required to make pursuant to section 316.2.

---

**3** Given our conclusion, we do not address the Agency's additional argument that father has forfeited his appellate claim by not timely appealing from the court's May 2009 and December 2010 rulings, other than to point out that a party cannot appeal from matters that it did not raise before the court to begin with, and cannot forfeit such claims regarding nonexistent rulings. Again, father did not raise the issue of whether he could pay for a test to the juvenile court before one was completed.

Section 316.2 provides in relevant part that the juvenile court, at the detention hearing or as soon thereafter as practicable, "shall inquire of the mother and any other appropriate person as to the identity and address of all presumed or alleged fathers." (§ 316.2, subd. (a).)  The court's inquiry should include such matters as:  whether a judgment of paternity already exists; the mother was married at the time of the child's conception or thereafter, was cohabiting with a man at the time of conception or birth of the child, or had received support payments or promises of support regarding the child or in connection with her pregnancy; any man formally or informally acknowledged or declared his possible paternity of the child, including by signing a voluntary declaration of paternity; paternity tests have been administered and the results, if any; and any man otherwise qualifies as a presumed father pursuant to Family Code section 7611, or any other provision of the Family Code.  (Welf. & Inst. Code, § 316.2, subd. (a)(1)-(7); see also Cal. Rules of Ct., rule 5.635(b) [regarding the court's duty to make a parentage inquiry].)[4]

Rule 5.635 "implements the provisions of section 316.2."  (*In re B.C.* (2012) 205 Cal.App.4th 1306, 1311 (*B.C.*).)  Under its terms, "[i]f a voluntary declaration as described in Family Code section 7570 et seq. has been executed and filed with the California Department of Social Services, the declaration establishes the paternity of a child and has the same force and effect as a judgment of paternity by the court.  A man is presumed to be the father of the child under Family Code section 7611 if the voluntary declaration has been properly executed and filed."  (Rule 5.635(c).)

Also, if the court determines through statements of the parties or other evidence that there has been no prior determination of the parentage of the child, the court "must take appropriate steps to make such a determination."  (Rule 5.635(e).)  The alleged father and his counsel "must complete and submit *Statement Regarding Paternity*," form JV-505, which "must be available in the courtroom."  (Rule 5.635(e)(1).)  "The juvenile court *may* order the child of any alleged parents to submit to genetic tests and proceed

---

[4] Further rule references are to the California Rules of Court.

16

under Family Code section 7550 et seq. [Uniform Act on Blood Tests to Determine Paternity]." (Rule 5.635(e)(2), italics added.) It also "may make its determination of parentage or nonparentage based on the testimony, declarations, or statements of the alleged parents." (Rule 5.635(e)(3).)

Nothing in the statute or rules we have reviewed so far requires a court to make a determination of biological parentage. The focus of section 316.2 is, as suggested by its title, on an "inquiry" into "presumed or alleged fathers." The court's duty of inquiry in section 316.2, subdivision (a) is as to "the identity and address of all *presumed or alleged fathers*." (Italics added.) Consistent with this focus, rule 5.635(e) indicates only that a court *may* order a paternity test. The use of the permissive term "may" indicates the court is not required to do so in the course of conducting its inquiry. (See, e.g.,Welf. & Inst. Code, § 15 [" 'Shall' is mandatory and 'may' is permissive"]; *People v. Lockwood* (1998) 66 Cal.App.4th 222, 227 ["[i]n general, . . . the word 'may' connotes a permissive standard as compared with the mandatory nature of the word 'shall' "].)

One provision does require the court to determine biological parentage. According to rule 5.635(h), "[i]f a person appears at a hearing in dependency matter or at a hearing under section 601 or 602 and requests a judgment of parentage on form JV-505, the court *must* determine: [¶] (1) Whether that person is the biological parent of the child; and [¶] (2) Whether that person is the presumed parent of the child, if that finding is requested." (Rule 5.635(h)(1)-(2), italics added.)

Father argues the juvenile court violated rule 5.635(h) by failing to determine biological paternity despite his request that it do so at the onset, in May 2009. We disagree for two reasons. First, and most obviously, father does not establish that he or his counsel maintained such a request for a judgment of parentage, on form JV-505 or otherwise. It is a father's request which mandates the inquiry. As this court explained in *Adoption of A.S.* (2012) 212 Cal.App.4th 188, " '[a] paternity judgment is, as the name implies, a judicial determination that a parent-child relationship exists. It is designed primarily to settle questions of biology and provides the foundation for an order that the father provide financial support. . . . Presumed father status, by contrast, is concerned

17

with a different issue:  whether a man has promptly come forward and demonstrated his " 'full commitment to his paternal responsibilities—emotional, financial, and otherwise.' " ' "  (*Id*. at p. 205.)  Here, however, father dropped his request for paternity testing in May 2009 in favor of a paternity inquiry that he hoped would result in his obtaining presumed father status.  Given these facts, he cannot maintain that he requested a judgment of paternity from the court that the court failed to pursue.

Second, the court *did* act to determine whether father was the biological parent of A.H.  In May 2009, the court entertained his request to have a paternity test.  It appears from the transcript the court was not adverse to ordering the test when father's counsel dropped the request in favor of proceeding immediately with a paternity inquiry that he hoped would result in his obtaining presumed father status.[5]  Even after father's counsel dropped the request, the court indicated that at the end of the hearing, he was welcome to test, testing became a part of his case plan, and in December 2010, the court *ordered* him to test.  Father did not test until more than a year later, in 2012, when he was determined to be the biological father.

Father argues that the court's determination to follow what he does not contest was the normal procedure for payment of the test—that father pay after having the test and only if he was found to be the biological parent—somehow impeded his ability to have the test.  Nothing in the record establishes this was an impediment.  It was only after he tested that he and his counsel contended that he had been unable to afford the test, initially as part of their explanation for his failure to test before 2012.  We fail to see how the court's following this normal payment procedure in the absence of father's assertion of any indigence was an error.

Father's other arguments are also unpersuasive.  After noting that "[t]he Legislature has already made it perfectly clear public policy . . . favors, whenever possible, the establishment of legal parenthood with the concomitant responsibilities" (*In*

---

[5] The juvenile court indicated it would not proceed with the paternity inquiry before the paternity test upon objection from mother's counsel.  Father does not contend this was improper.

18

*re Marriage of Buzzanca* (1998) 61 Cal.App.4th 1410, 1423) and the "compelling state interest in establishing paternity for all children" (Fam. Code, § 7570, subd. (a)), he argues the juvenile court committed the same violations as the court in *B.C.*, *supra*, 205 Cal.App.4th 1306. B.C., a minor, was removed from his mother, who identified a man, R.P., as the father, but had no information about his whereabouts. (*Id*. at pp. 1308-1309.) R.P. was found to be an alleged father only, and not entitled to reunification services. (*Id*. at p. 1309.) Over a year later, after reunification services were terminated and R.P. was located, he appeared at a section 366.26 hearing. The court appointed him counsel and continued the hearing. R.P. then filed a written notice for genetic testing, which the court authorized, but at R.P.'s expense. (*B.C.*, at pp. 1309-1310.)

Subsequently, R.P. filed a section 388 petition, for which the court granted a hearing. R.P. then filed a form JV-505, in which he requested genetic testing to determine whether he was the biological father. He declared he did not recall ever knowing the mother, but acknowledged the possibility he was B.C.'s father, and that he came forward immediately when he learned of the dependency proceedings. He asserted the desire "to 'meet his obligations to be a father' " to B.C. if he was his father. The court found the order requested in the petition would not be in the child's best interests, denied the petition, and R.P. appealed. (*B.C.*, *supra*, 205 Cal.App.4th at pp. 1310-1311.)

The appellate court agreed with R.P. that the juvenile court had failed in its duty to determine that he was B.C.'s biological father, given the mandate stated in rule 5.635(h)(1) when a party files a form JV-505 and R.P.'s desire to meet his paternal obligations. It criticized the juvenile court for requiring that R.P. pay for the test and not making a determination of biological paternity. (*B.C.*, *supra*, 205 Cal.App.4th at pp. 1312-1313.) It did *not* consider the requirement that R.P. pay to be found determinative, however. Instead, it relied on the failure of the court to actually determine biological paternity before proceeding. It stated, in rejecting the argument that the court had complied with rule 5.635(h)(1) by granting R.P.'s requests for paternity testing, leaving only the issue of payment before the appellate court, "granting R.P. access to B.C. for the purpose of genetic testing did not fulfill the juvenile court's obligation to *determine*

19

biological paternity and thus constituted a violation of rule 5.635(h)(1). (*B.C.*, at p. 1314.)

*B.C.* is distinguishable from the present circumstances in two critical respects. Although father contends he requested a judgment of parentage in May 2009, we conclude he did not, on form JV-505 or otherwise, as we have already discussed. At most, he sought presumed father status and visitation rights. Therefore, the holding of *B.C.*, which rests on the mandatory duty of the trial court pursuant to rule 5.635(h)(1), simply does not apply here. Instead, the court was free to act pursuant to its discretionary powers to order, or not order, paternity testing pursuant to rule 5.635(e)(2).

Also, the juvenile court did all it could to determine whether or not father was the biological father whenever father put the issue before the court. Nothing in *B.C.* indicates the court ordered R.P. to test; here, father was both ordered to test in December 2010, and, as reported by the Agency to the court in 2012, determined to be the biological father—before the court considered the father's first request for reunification services or his section 388 petition. Therefore, *B.C.* is inapposite.[6]

Father also argues he was prejudiced by the court's failure to comply with rule 5.635(g). It states that, "[i]f, after inquiry by the court . . . , one or more persons are identified as alleged parents of a child for whom a petition under section 300 . . . has been filed, the clerk must provide to each named alleged parent, at the last known address, by certified mail, return receipt requested, a copy of the petition, notice of the next scheduled hearing, and *Statement Regarding Parentage (Juvenile)* (form JV-505)." As father points out, despite this requirement, nothing in the record indicates the clerk

---

[6] In support of his argument that the court erred by failing to make a complete paternity determination, father also cites to *In re J.H.* (2011) 198 Cal.App.4th 635, 649, and *In re Paul H.*, *supra*, 111 Cal.App.4th 753. He does not explain the significance of these citations, however, and they are not apparent to us under the present circumstances. Therefore, we do not discuss these cases further. (See, e.g., *In re S.C.* (2006) 138 Cal.App.4th 396, 408 ["[t]o demonstrate error, appellant must present meaningful legal analysis"].)

20

mailed this form to father after mother's testimony in February 2009 and the court's determination that father was an alleged father.

We do not find the lack of such a mailing to be prejudicial to father, however. Rule 5.635(e)(1) provides that father and his counsel are required to submit a form JV-505 to the court, which form "must be made available in the courtroom." Father does not contend it was not available. We presume it was available in the courtroom for two reasons. First, the record gives at least one indication that it was available; at the January 2009 hearing, the court adopted the Agency's recommended order that "[a]ny man present . . . claiming to be the father of the minor is ordered to complete a JV-505 Paternity—Waiver of Rights form prior to leaving the courtroom today unless that form was previously submitted." Second, "[a] ' " 'judgment or order of the lower court is *presumed correct*[, and a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent[.]' " ' " (*In re Julian R.* (2009) 47 Cal.4th 487, 498.)

Despite form JV-505's availability, father does not establish that he or his counsel submitted it to the court, maintained a request for a judgment of paternity, or filed a voluntary declaration as described in Family Code section 7570 et seq. that would have entitled him to presumed father status pursuant to rule 5.635(c). The record suggests a reason for his inaction: his statements in 2012 indicate that, despite his May 2009 testimony and his pursuit of presumed father status then, he was unwilling to fully accept parental responsibility for A.H. at that time. For all of these reasons, we conclude any failure by the court to mail him a JV-505 form as required by rule 5.635(e)(1) undoubtedly was not prejudicial to him.

Finally, father argues the juvenile court acknowledged error based on its statement at the December 27, 2012 hearing, when it denied his section 388 petition. The court stated: "I must say, if this case goes on appeal, we may have trouble . . . . I've had growth process in handling dependency cases, where I, back in 2009, said to [father], 'if you want a paternity test, you pay for it.' My growth has been, over the months and years, to encourage fathers to be more involved with their children, and also with their

21

children's dependency cases where I would not say that to [father] right now. I would said, 'County, pay for it'. . . . That might not have been the best approach back in 2009." We disagree that this is an acknowledgement of any legal error. The court expressed its thoughts about acts within its discretion and speculated about how they might be viewed on appeal, nothing more.

In short, we conclude father's claim that the juvenile court violated his due process rights by failing to fully determine parentage pursuant to section 316.2 lacks merit.

### III. *The Court's Consideration of Father's Section 388 Petition*

Father also argues the court violated his due process rights by holding an unauthorized hearing to consider his section 388 petition, in which father sought modification of the court's prior orders, abused its discretion by denying the petition, and improperly denied his request in the petition for *Kelsey S.* status. We conclude these arguments are without merit, much for the same reasons.

### A. *The Court's Hearing Procedure*

According to father, the juvenile court violated his due process rights by hearing argument from counsel on whether or not to order a full evidentiary hearing on his section 388 petition, without affording him procedural safeguards. We agree with the Agency that this argument has been forfeited because of father's failure to first object to the court's procedure below. Also, to the extent any error occurred, father undoubtedly was not prejudiced by it.

### 1. *Relevant Proceedings Below*

At the November 30 section 366.26 hearing, the court indicated it had received father's section 388 petition, which had to be considered before the section 326.26 hearing proceeded. It asked if counsel wanted to be heard on whether father had made a prima facie showing that would require a hearing. Father's counsel did not hesitate to argue his position. Mother's counsel supported father's position, while counsel for the Agency and A.H. opposed it. The court asked counsel for the Agency if mother's testimony did not amount to a change of circumstances, given that she said she had purposely kept father from A.H., and father had pursued contact with A.H.

22

At the December 27 hearing, the court indicated that it had not yet received the transcript of the previous argument, and asked counsel if they were prepared to reargue their positions. Father's counsel indicated he was, and went on to argue why father was entitled to a hearing on his petition. He emphasized that, at the section 366.26 hearing, mother had testified for the first time that she had not allowed father to see A.H. after the couple had broken up, had done everything she could to keep him away from the child, and that the couple had lived together for the first several months of A.H.'s life. Counsel asserted that he had been stopped at the section 366.26 hearing from asking certain questions relevant to father's elevation to natural father status pursuant to *Kelsey S.* He had not yet had the opportunity to interview father and mother further to find out more pertinent facts, and intended to do so prior to a hearing on father's petition. Father, he said, would have completed the paternity test earlier if the court had ordered the Agency to pay for it. He also argued it was in A.H.'s best interest to know father, who was a sincere, loving, and great father, as indicated by his treatment of his other children.

The other counsel also argued their positions. Counsel for mother once again supported father's request for a hearing, while counsel for the Agency and A.H. opposed it. The opposing counsel emphasized that father did not qualify as a *Kelsey S.* father because he had not come forward quickly enough to assume full responsibility for A.H., there were no significant changes in circumstances, and it was not in A.H.'s best interests, as indicated by Dughman's reports, to delay her permanency planning any longer.

The court was given a copy of Dughman's December 20 update letter and reviewed it during a break in the hearing. Counsel for the Agency asked that it be admitted into evidence in the section 366.26 proceeding, as had other reports, and that the court consider it in determining whether the best interests of the child would be served by the change requested by father in his petition, but not admit it for the section 388 hearing. Counsel for A.H. had no objection to the update letter's admission into evidence because, "if the court's going to admit it into evidence on the record, in the .26 hearing, then I think it can be referred to for all three purposes." The court then asked counsel for

23

mother and father if they "have any objection to its admissibility for all three hearing purposes" and they did not. The court then stated, "It's admitted for all three hearing purposes," but not for "the de facto parent application," apparently an indication that it was not being admitted for the purposes of a hearing on the section 388 petition, which hearing the court had not yet determined was to occur.

The parties submitted the matter at the hearing, at which time the court announced its decision to deny the petition without conducting an evidentiary hearing. It found there was not a sufficient change in circumstances, father did not qualify as a *Kelsey S.* father because he could have done more and did not, stated that, even if it had found a sufficient change of circumstances, it would in "no way find that it's in the best interest of [A.H.] at this point to have a new adult introduced into her life, based primarily on the [November 7 and December 20] reports . . . ," and read into the record sections of Dughman's December 20 update letter. As we have already discussed, the court acknowledged that it would have handled the issue of father's paternity testing differently in 2009 based on what it had learned since that time.

### 2. *Forfeiture*

The Agency asserts that father has forfeited this appellate claim by his failure to first raise it in the juvenile court. As we have discussed, generally, a party is precluded from urging on appeal any point not first raised below. (*Riva M.*, *supra*, 235 Cal.App.3d at pp. 411-412.) Although forfeiture is not automatic, we should exercise our discretion to excuse it in rare instances only, particularly in dependency cases. (*In re S.B.*, *supra*, 32 Cal.4th at p. 1293.)

Here, father argues the juvenile court held an improper hearing about his petition on November 30 and December 27, 2012, before summarily denying it. However, in each instance, father's counsel not only did not object to any aspect of the proceedings or argument presented, but welcomed the opportunity to argue on behalf of father. We

agree with the Agency that father has forfeited his appellate claim regarding the court's hearing procedure under these circumstances.[7]

We also agree with the Agency that father's forfeiture includes any claim that the court improperly admitted Dughman's December 20 update at the December 27 hearing. His counsel was specifically asked by the court if he had any objections to its admission, and counsel indicated he did not.

### 3. *Father Was Not Prejudiced By the Court's Hearing Procedure*

Regarding the merits of father's argument, a section 388 petition "must be liberally construed in favor of its sufficiency." (*In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413.) "[T]he court may summarily deny the motion if the petition fails to make a prima facie showing (1) of a change of circumstances or new evidence requiring a changed order, and (2) the requested change would promote the best interests of the child." (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188-189 (*Justice P.*).) In assessing the best interests of the child, " 'a primary consideration . . . is the goal of assuring stability and continuity.' " (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 616.) "In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case." (*Justice P.*, at p. 189.)

We "review the juvenile court's denial of a section 388 petition for an abuse of discretion. [Citation.] The court 'exceeds the limits of legal discretion by making an arbitrary, capricious or patently absurd determination.' [Citation.] . . . ' ["]When two or more inferences can reasonably be deduced from the facts, the reviewing court has no

---

[7] The Agency also argues father's petition was untimely filed after the evidentiary portion of the section 366.26 hearing had been conducted, based on *In re Marilyn H.* (1993) 5 Cal.4th 295 (*Marilyn H.*). Father correctly asserts that the Agency has forfeited this argument by failing to first raise it in the juvenile court. In any event, the discussion in the first paragraph in *Marilyn H.* strongly suggests that a section 388 petition *can* be brought in the midst of a section 366.26 hearing, particularly when considered with the fact the court affirmed a juvenile court ruling that was based in part on this view. (*Marilyn H.*, at pp. 298-299.) Therefore, the Agency's untimeliness argument is unpersuasive.

authority to substitute its decision for that of the trial court." [Citation.]' " (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 616.)

Father asserts that the juvenile court could either summarily deny his section 388 petition without hearing argument from counsel or hold an evidentiary hearing, citing as support *In re Lesly G.* (2008) 162 Cal.App.4th 904, 912. He asserts the court abused its discretion by creating "a third option that was neither sanctioned nor provided for in the statute." *Lesly G.* does not address the issue before us. We are not aware of anything that prevents a court from hearing argument from the parties before determining whether to summarily deny a section 388 petition or order an evidentiary hearing regarding it. It is analogous to a trial court hearing argument from counsel regarding an ex parte application by one side or the other, a common occurrence.

That said, we need not determine the issue because any error by the court in its hearing procedure was harmless beyond a reasonable doubt and, therefore, harmless under the state standard (*People v. Watson* (1956) 46 Cal.2d 818, 836), and even under the federal standard if it were to apply here (*Chapman v. California* (1967) 386 U.S. 18, 24). We reach this conclusion for three reasons.

### a. *Counsel Did Not Testify*

First, father asserts that the court erred because, in hearing argument from counsel, it "effectively allowed the testimony of counsel to be offered as 'evidence' regarding father's prima facie showing." Putting aside that father does not cite a single specific instance that demonstrates this occurred, we have examined the transcript of the hearing and have not found any such testimony. Counsel presented nothing more than argument based on the record of the proceedings, which record the court could consider in determining whether or not to summarily deny the petition. (*Justice P.*, *supra,* 123 Cal.App.4th at pp.188-189.)

### b. *The Court Properly Considered Dughman's December 20 Update*

Second, father asserts that he was prejudiced by the improper admission of "documentary evidence in opposition to father's petition," apparently a reference to the court's consideration of Dughman's December 20 update. Even if he had not forfeited

26

this claim, it too lacks merit. The court admitted the update into evidence as a part of the pending section 366.26 proceeding, making it a part of the record of the case. The court could consider the record in determining whether or not to summarily deny the petition. (*Justice P.*, *supra,* 123 Cal.App.4th at pp.188-189.) Therefore, the court could consider the update regarding the section 388 petition, and did not commit any error by doing so. In any event, the court also relied on Dughman's November 7 letter, which reached the same conclusions regarding A.H.'s best interests.

### c. *The Juvenile Court Undoubtedly Would Have Summarily Denied Father's Petition Without Hearing Argument*

Third, we have no doubt the juvenile court would have summarily denied father's section 388 petition without hearing oral argument. Although the court initially indicated at the November 30 hearing that there might be a sufficient change of circumstances or new evidence asserted by father in his petition, it later determined otherwise. The record fully supports this conclusion. Furthermore, the court correctly and emphatically concluded that it was not in A.H.'s best interests to grant father the relief he sought.

In his section 388 petition, father requested that the juvenile court find him to be a *Kelsey S.* father with the right to reunification services. In *Kelsey S.*, *supra*, 1 Cal.4th 816, our Supreme Court was concerned with the unequal treatment of natural fathers under the adoption statutes, as compared with mothers and presumed fathers. (*Id*. at pp. 823–825.) Kelsey S. was a boy fathered by a man in the midst of divorce proceedings with his wife. He understood the mother was placing Kelsey S. for adoption, and objected to it because he wanted to rear the child. Two days after the child's birth, he filed an action in superior court to establish his parental relationship with the child and obtain custody of him. The court gave him temporary custody of the child and stayed all adoption proceedings. The prospective adoptive parents petitioned for the adoption to proceed, given the mother's consent and the absence of a presumed father, which the father opposed. Ultimately, the parties stipulated that the father was in fact the child's natural father, the court ruled he was not a "presumed father," and the court found by a bare preponderance of the evidence that the child's best interest required termination of

27

the father's parental rights. Father appealed, and the appellate court affirmed the juvenile court's ruling. (*Id*. at pp. 822-823.)

Our Supreme Court reversed in *Kelsey S.* Its analysis relevant to this case was well-summarized in *In re D.M.* (2012) 210 Cal.App.4th 541: "[T]he biological father, who was not married to the mother, could not be a statutorily presumed father because he could not prove that he had taken the child into his home; the mother had prevented him from doing so. Since only statutorily presumed fathers had authority under the adoption statutes to consent (or withhold consent) to the adoption of their children, the biological father had no say in the mother's decision to release their child for adoption. The Supreme Court concluded that the adoption statutes violate the biological fathers' right to due process and equal protection of the law to the extent that they permit the mother to unilaterally preclude her child's biological father from being a presumed father. (*Kelsey S., supra*, 1 Cal.4th at p. 849.) . . .

"*Kelsey S*. explained that the disparate treatment was not substantially related to the identified governmental interest of protecting the child's best interests. 'The child has a genetic bond with its natural parents that is unique among all relationships the child will have throughout its life. "The intangible fibers that connect parent and child have infinite variety. They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility." [Citation.] It therefore would be curious to conclude that the child's best interest is served by allowing the one parent (the mother) who wants to sever her legal ties to decide unilaterally that the only other such tie (the father's) will be cut as well. Absent a showing of a father's unfitness, his child is ill-served by allowing its mother effectively to preclude the child from ever having a meaningful relationship with its only other biological parent.' (*Kelsey S., supra*, 1 Cal.4th at p. 848, quoting *Lehr v. Robertson* (1983) 463 U.S. 248, 256.)

"*Kelsey S*. concluded, 'If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. Absent such a

28

showing, the child's well-being is presumptively best served by continuation of the father's parental relationship. Similarly, when the father has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother.' (*Kelsey S., supra*, 1 Cal.4th at p. 849.)

"*Kelsey S.* was extended to dependency proceedings in [*In re*] *Julia U.* [1998] 64 Cal.App.4th 532 [(*Julia U.*)], where an unmarried biological father challenged orders denying him reunification services and terminating his parental rights. The *Julia U.* court concluded that in a dependency case, if an unwed biological father 'comes forward and demonstrates a full commitment to his parental responsibilities, his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent.' (*Id.* at pp. 540-541.) *Julia U.* listed the factors the juvenile court should consider: 'In determining whether a biological father has demonstrated such commitment, the father's conduct both before and after the child's birth must be considered. [Citation.] Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. [Citation.] In particular, the father must demonstrate a willingness himself to assume full custody of the child—not merely to block adoption by others. [Citation.] A court should also consider the father's public acknowledgment of paternity, his payment of pregnancy and birth expenses commensurate with his circumstances, and prompt legal action to seek custody of the child.' (*Id.* at p. 541, citing *In re Zacharia D., supra*, 6 Cal.4th at p. 450, fn. 19 & *Kelsey S., supra*, 1 Cal.4th at p. 849.)" (*In re D.M., supra*, 210 Cal.App.4th at pp. 550-551.)

In his petition, father did not make a prima facie showing of any change in circumstances, new evidence, or A.H.'s best interests that, if proven, would justify the court modifying its previous orders to designate him as a *Kelsey S.* father with a right to reunification services. First, he asserted that he had been found to be A.H.'s biological father and had a stable living situation. While his biological paternity was a recent determination, three years before, in 2009, he had claimed A.H. as his own, but had nonetheless testified that he had provided little support for A.H. and failed to demonstrate

a willingness to support or otherwise accept full responsibility for her in the future, after which the court denied his request for presumed father status. Father's new-found biological status and stable living situation did not alter these facts, and he did not at the time of the petition indicate he was willing to accept full responsibility, custody, and support for A.H. Also, during the approximately *three years* between his acknowledgment of paternity in May 2009 and his July 2012 request for reunification services (including during the approximately two years that A.H. was in foster care), he visited A.H. only twice and cancelled a third visit, was frequently absent from court proceedings and/or out of touch with the Agency, failed to promptly comply with the court's order that he complete a paternity test, never indicated he could not afford a paternity test, and, according to statements by him and his counsel in July 2012, believed he probably was not A.H.'s father despite his prior sworn testimony until the 2012 paternity test indicated otherwise.

This is a far cry from the facts discussed in *Kelsey S.* and *Julia U.* The discussion in those cases turned on whether the biological father had promptly come forward to assume full responsibility for the child in the face of unilateral obstacles put up by the mother. Father unquestionably did not. To the contrary, despite having every opportunity to assert that he was ready, willing, and able to assume full parental responsibility for A.H., father repeatedly demonstrated for the approximately three years that preceded his petition that he was *unwilling* to do so. In other words, father's own disinterest, not any unilateral action by mother, was responsible for his inability to obtain presumed father status. (See *Adoption of O.M.* (2008) 169 Cal.App.4th 672, 680 [finding father's own continued criminal activity contributed more to his not providing support to the child, not any unilateral action by mother].)

Also, contrary to father's arguments throughout his appellate briefs, and as we have already discussed, there was no evidence in the record that the juvenile court hindered his efforts to obtain the results of a paternity test, given that he had never raised before the court that he could not afford the testing or objected to the standard payment procedure. In any event, father acknowledged his paternity in May 2009, making his

subsequent approximately three years of disinterest particularly noteworthy. Also, at the July 2012 hearing, he confirmed to the court that his concern about A.H.'s adoption was that his "relatives were being considered for adoption" of A.H. In other words, even then, he appeared more concerned with blocking the adoption by others than about accepting full responsibility for A.H., an insufficient basis for *Kelsey S*. status. (*Julia U.*, *supra*, 64 Cal.App.4th at p. 541.)

For much the same reasons, we also conclude father did not make a prima facie showing that there was any new evidence that supported his petition. Father first cited testimony given at the November 27 hearing by mother that he was a "great father" when the three had lived together, which included for a period of time after A.H.'s birth, and that he was "relentless" in trying to visit A.H., and that mother had hid the child from him. He also referred to the caseworker's testimony at the same hearing, which supposedly was that father was "sincere" in trying to establish a relationship with A.H., and regularly visited and supported two other biological children. The Agency correctly points out that father's characterizations of this testimony are not entirely accurate. In any event, the testimony has virtually no significance regarding whether he was entitled to *Kelsey S.* status in light of his more recent conduct. That conduct involved his almost complete disinterest in parental responsibilities towards A.H. from June 2009 until 2012, his unwillingness to *fully* assume them at any time since 2009, his disregard of the court's order regarding paternity testing, and his modest activity in pressing any position in the proceedings prior to July 2012, at which time adoption was finally looming ahead. Similarly, we find father's contention that there were "several holes in the narrative" that needed closing at an evidentiary hearing to be unpersuasive in light of father's years of disinterest.

In his petition, father also asserted, without elaboration, that it was in A.H.'s best interests to have a relationship with her father. He asserted nothing to support this. We have already discussed his three years of disinterest, which rendered him a virtual stranger to A.H. The only evidence in the record regarding the impact of his introduction into A.H.'s life are Dughman's November 7 and December 20 reports. In them,

31

Dughman stated emphatically and without qualification that permanency was critical for A.H.'s development, particularly in light of her past trauma, and that introducing father, a stranger to her, would be scary and confusing, and likely cause her to think she might be separated from her primary caregiver, who had provided the home that A.H. needed. The court's statements at the December 27 hearing made clear that, even if father had made sufficient contentions of a change of circumstances, the court would in "no way" find it was in A.H.'s best interests to modify its prior orders so as to give father *Kelsey S.* status. The record fully supports this conclusion. On appeal, father argues only the generic value of a child knowing his or her father, which is entirely unpersuasive under the particular circumstances of this case.

For each and all of these reasons, we conclude beyond any reasonable doubt that father was not prejudiced by any error the court may have made in its section 388 hearing procedure, assuming for the sake of argument that it made an error. Therefore, father's argument does not provide any basis for reversal.

## B. *The Juvenile Court Did Not Abuse Its Discretion in Denying Father's Petition*

Father next argues the juvenile court improperly denied his section 388 petition because he made a prima facie showing of new evidence and/or changed circumstances that would be in A.H.'s best interests to warrant a full hearing. As our discussion directly above indicates, we disagree. The record strongly supported the court's denial of father's petition for the reasons we have already stated. The court did not abuse its discretion in doing so.

## C. *Father's Kelsey S. Argument Lacks Merit*

Father also makes the curious argument that the juvenile court erred because substantial evidence supported his request for *Kelsey S.* status. This too is unpersuasive for two reasons.

First, as the Agency points out, father did not ask for, and the court did not make, any ruling independent of its denial of father's section 388 petition regarding his *Kelsey S.* status. Therefore, we fail to understand the basis for this argument as an independent appellate claim. Nor does father explain why there would be error in light of "substantial

evidence" that purportedly supports his contention.  The only applicable standard for our review of the juvenile court's ruling is the abuse of discretion standard applicable to review of section 388 petition rulings, which we have already discussed.

Second, we do not find substantial evidence to support any belated request for *Kelsey S.* status.  Father's three years of disinterest are a far cry from the facts required for such a designation, as indicated in *Kelsey S.* and *Julia U.*

### IV.  *Father's Additional Due Process Claim*

Finally, father argues that the termination of his parental rights violated his federal and state due process rights because the juvenile court never determined that he was an unfit parent, but was required to do so.  Again, we disagree.

Father asserts in his opening brief, after citing *Santosky v. Kramer* (1982) 455 U.S. 745 and a variety of state cases, that in California, "[t]o comply with due process, a finding of detriment must be made by clear and convincing evidence before terminating a parent's parental rights."  He contends that the juvenile court, rather than make such a finding, "thwarted" his "several attempts to elevate his status to presumed father status" by its "erroneous discretionary denial of his requests for genetic testing and a paternity determination."  This resulted in an "incomplete due process protection in parental rights termination proceedings since father's paternity and parental fitness were never correctly addressed by the juvenile court."

However, father acknowledges that appellate courts have determined a finding of parental unfitness is not constitutionally required if a man is only a biological or alleged father who has not elevated his status to presumed father.  In such a case, he concedes, his rights can be terminated solely by considering the child's best interests.  As one appellate court he cites has stated, "a biological father's rights are limited to establishing his right to presumed father status, and the court does not err by terminating a biological father's parental rights when he has had the opportunity to show presumed father status and has not done so."  (*In re A.S.* (2009) 180 Cal.App.4th 351, 362; see also *In re Jason J.* (2009) 175 Cal.App.4th 922, 933 [" '[A] biological father's "desire to establish a

33

personal relationship with a child, without more, is not a fundamental liberty interest protected by the due process clause" ' "].)

Father attempts unpersuasively to distinguish his circumstances and view of the law from those discussed in this case law. However, we will not discuss these and father's other arguments further because of a central flaw with his claim. At the heart of it are certain explicit or implicit assumptions that we do not share, namely that (1) father acted promptly and diligently to elevate his status to presumed father; (2) father's conduct more closely approximated the actions of a presumed father and he should have been treated as such at the section 366.26 hearing; (3) father made "numerous efforts" to establish his paternity; (4) the juvenile court erroneously required father to pay for paternity testing and did not make the statutorily required paternity determination, thereby preventing him from elevating his status to biological father in 2009; and (5) the juvenile court erred in denying him *Kelsey S.* status. As we have discussed, the juvenile court did not err. Furthermore, after approximately three years of disinterest, father presented himself as a biological father who was interested in having a relationship with his daughter, but did not even then assume full responsibility for her. Under these circumstances, the court was not required to make any more findings than it did before terminating his parental rights.

In light of our conclusion that father's appeal lacks merit, we also reject mother's appeal, which is based entirely on father winning a reversal of the court's termination of his parental rights. Given our conclusions, we do not address the other arguments raised by the parties.

34

## DISPOSITION

The judgment is affirmed.

_____
Brick, J.*

We concur:

_____
Haerle, Acting P.J.

_____
Richman, J.

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.