Filed 1/30/15  In re Michael W. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re MICHAEL W., a Person Coming Under the Juvenile Court Law. | B257109 (Los Angeles County Super. Ct. No. CK97602) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>S.A.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Anthony Trendacosta, Commissioner.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Kim Nemoy, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant S.A. (S.) is the biological father of Michael W., the subject of this dependency proceeding. He appeals from a juvenile court order denying his motion for presumed father status, contending the order lacks substantial evidentiary support. He also contends the juvenile court erroneously failed to inquire about his American Indian heritage, in violation of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA). We find no error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Michael, then about one month old, came to the attention of respondent Department of Children and Family Services (DCFS) on January 22, 2013, when the agency responded to a referral claiming several drug users were squatting in a filthy, cockroach infested "crack house," and had an infant with them. Among the people living in the home were Michael's mother, Felicia D. (mother, who is not a party to this appeal) and her companion Noel W. (Noel). Both mother and Noel identified Noel as the baby's biological father. The baby was initially allowed to remain with mother, who denied that she or Noel abused drugs. Michael was subsequently placed in foster care, with the permission of mother and Noel, after mother tested positive for amphetamines and methamphetamines and Noel admitted smoking marijuana several times a day. The parents agreed to participate in drug treatment programs and other services.

On February 4, 2013, DCFS filed a Welfare and Institutions Code section 300,[1] subdivision (b) petition which, as ultimately sustained, alleged that due to their respective unresolved substance abuse problems, mother and Noel were incapable of providing regular care for Michael, and their ongoing drug use placed him at risk of physical harm. Mother and Noel each signed and submitted standardized "Parental Notification of Indian Status" forms denying Indian ancestry. (Capitalization omitted.) At the detention hearing on

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

February 4, 2013, the juvenile court determined that ICWA did not apply, declared Noel to be Michael's presumed father and detained the child.

The jurisdictional/dispositional hearing was conducted on March 21, 2013. DCFS's report for that hearing detailed mother's and Noel's respective criminal histories, their admittedly extensive drug histories, and mother's history of mental health problems and failure to obtain treatment and/or to comply with a treatment plan. The report also revealed that Noel tested positive for amphetamines and methamphetamines once in January 2013, and that both he and mother were "NO SHOWS" for drug testing on February 6 and 7. At the hearing, mother and Noel pleaded no contest to the amended petition. Michael was declared a dependent, removed from parental custody, and mother and Noel were given reunification services and monitored visitation.

The six-month review hearing was conducted on October 4, 2013. By then, mother's whereabouts were unknown, Noel was incarcerated, and DCFS reported that both parents had expended minimal effort to comply with the court-ordered case plan and had visited Michael on very few occasions. The matter was set for a contested hearing (§ 366.21, subd. (e)), on October 23, 2013.

In its supplemental report for the October 23 hearing DCFS indicated that, in mid-October mother informed the agency that S. "may or may not be [Michael's] father." She had been involved with S. and Noel about the same time, but did not want S. in Michael's life due to his drug addiction and criminal history. S. told DCFS that he "[felt] certain that he [was] indeed the father of the child." Even so, he requested a paternity test and conditioned his willingness to assume custody on proof that he was Michael's biological father.

Mother informed DCFS that she had been involved with S. in mid-April 2012, before she met Noel. S. knew she was pregnant before she went to jail in June 2012. Mother said that S. "was never there for [her] during [her] pregnancy." In the past, S. "didn't want any part," but after she posted photos on Facebook of Michael following his birth, S. "hit [her] up and said, 'Oh, that's my son.'"

S. acknowledged to the CSW "that he was aware that [mother] was pregnant by April 2012 because she told him" after she had become involved with Noel and S. ended their

3

relationship. S. found out about the October 23 hearing after mother contacted him on Facebook to say he needed to go to court if he did not want his son in foster care. S. declared on a statement regarding paternity that he believed he was Michael's parent, and claimed mother kept the infant hidden from him until October 4, at which point he immediately contacted DCFS.

A selection and implementation hearing (section 366.26) was set for February 19, 2014. In its report for that hearing DCFS indicated that mother and Noel had last visited Michael on April 3, 2013. The agency opined that it was in Michael's best interest that parental rights be terminated to free the child for adoption by his current caretaker. The February 19, 2014 section 366.26 hearing was continued to April 8 at the request of S., who had received that day the results of DNA testing revealing that he was Michael's biological father and needed some time to prepare.

In connection with the April 8 hearing, DCFS reported that S. said he saw mother in "March or April 2012 . . . . By that time, [he] found out the mother was pregnant." S. was subsequently incarcerated and, by the time of his release in July 2012, mother had become involved with Noel, so S. terminated his relationship with her. Mutual acquaintances told S. that mother said he was not the child's father. He asked mother whether the baby was "his," but she just changed the subject. In early October 2013, mother contacted S. on Facebook, told him he was Michael's father and said he needed to go to court to prove Noel was not Michael's father and prevent the child from being adopted. S. had monitored visits with Michael in early December 2013, late February 2014 and thereafter. S. was appropriate with Michael during visits, but when they ended Michael was "very happy to see his adoptive foster mother and [ran] to her." DCFS continued to recommend adoption as Michael's permanent plan, and advised the court that the caretaker's adoptive home study had been approved. The section 366.26 hearing was continued to June 10, 2014, to permit transportation of Noel. S.'s counsel was directed promptly to file any motion or section 388 petition requesting presumed father status.

On May 9, 2014, S. filed a "MOTION FOR PRESUMED FATHER STATUS." In a declaration submitted in support of that motion—which the court treated as a section 388

4

petition—S. stated that mother told him she was pregnant with "[their] child" in March 2012, and he had no reason to doubt her. S. was incarcerated in April 2012. After his release in July 2012, he looked for mother but could not find her and acquaintances told him that mother said he was not the father of the child she carried.

S. further declared that mother contacted him through Facebook in late November 2012 after hearing he had been looking for her. S. responded the following day, and "told her to contact [him], to help with the baby," but she never responded. In December 2012, S. learned through Facebook that mother had "delivered [their] baby boy." After seeing a photograph of the newborn S. "instantly knew he was [his] son." He continued unsuccessfully to search for mother or to contact her on Facebook. He said he "believed that [mother] was keeping [their] son from [him] because she thought [S.] would take him away from her."

When mother contacted S. through Facebook on October 4, 2013, she asked him "to call her 'asap' because she was at court and [their son] was going to be 'gone for good'" unless she could prove Noel was not his father. S. declared that he responded to mother's message immediately, asking what he needed to do to prevent the child's removal, but that mother then told him to forget it because he was trying to take Michael from her and she would not let that happen. S. contacted DCFS and was informed about the October 23, 2013 hearing. S. declared that, but for mother's attempt to hide Michael and the dependency action from him, he would have come forward immediately to establish paternity.

On June 10, 2014, the juvenile court denied S.'s motion seeking status as a presumed father, and identified adoption as Michael's permanent plan. This timely appeal followed.

**DISCUSSION**

S. contends the court erred when it denied his motion for presumed father status, and by failing to inquire about his American Indian heritage. We find that the latter contention has merit but the error was harmless.

1.      *S. failed to demonstrate an entitlement to status as a Kelsey S. father.*

"Dependency law recognizes four types of fathers: alleged, de facto, biological, and presumed." (*In re D.M.* (2012) 210 Cal.App.4th 541, 544.) Only presumed fathers are

5

entitled to custody and reunification services. (*Ibid.*) A man is a presumed father if he meets the criteria of Family Code section 7611. Under Family Code section 7611, subdivision (d), a man who has neither legally married nor attempted to marry the child's mother may attain presumed father status if he "receives the child into his home and openly holds out the child as his natural child." The California Supreme Court has held that a biological father who does not qualify as a statutorily presumed father may nevertheless attain that status if he has made "a full commitment to his parental responsibilities—emotional, financial, and otherwise," but a third party has thwarted his efforts to achieve presumed father status under Family Code section 7611, subdivision (d). (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 849 (*Kelsey S.*).)

*Kelsey S.*, *supra*, 1 Cal.4th 816 was not a dependency action, but its holding has been extended to dependency proceedings. (See, e.g., *In re Julia U.* (1998) 64 Cal.App.4th 532, 540–541 (*Julia U.*); *In re D.M.*, *supra*, 210 Cal.App.4th at p. 551.) In determining whether a biological father qualifies as a *Kelsey S.* father, the juvenile court considers whether the man's conduct evidences a full commitment to his parental responsibilities, both before and after the child's birth. (*Julia U.*, at p. 541.) "Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. [Citation.] In particular, the father must demonstrate a willingness himself to assume full custody of the child—not merely to block adoption by others. [Citation.] A court should also consider the father's public acknowledgment of paternity, his payment of pregnancy and birth expenses commensurate with his circumstances, and prompt legal action to seek custody of the child." (*Ibid.*)

A biological father has the burden in the juvenile court to demonstrate the factual basis for his claim to *Kelsey S.*, *supra*, 1 Cal.4th 816 status. (*Adoption of O.M.* (2008) 169 Cal.App.4th 672, 679.) Generally, courts review *Kelsey S.* determinations for

6

substantial evidence (e.g., *id*. at pp. 679–680; *In re J.L.* (2008) 159 Cal.App.4th 1010, 1023, fn. 5.)[2]

Here, the relevant facts are largely undisputed. S. learned about mother's pregnancy as early as March 2012, shortly before he was incarcerated. She told S. the child was his, and he concedes he had no reason to doubt her. S.'s incarceration ended when mother was about four months pregnant. He made an effort to find mother, but was unable to do so. Meanwhile, mutual acquaintances told S. that mother claimed the baby was not his. Mother contacted S. through Facebook in November 2012, just before Michael's birth. S. responded, telling mother that "if [she] need[ed him] to do something for the baby [she could] hit [him] up," but otherwise he wanted her to know he was "happy with [his] family. . . ."

On December 6, 2012, mother sent S. a Facebook message stating she needed to talk to him. S. responded, and mother told him about a problem involving her mother about which she could not do anything because she would be "popping anytime." S. did not respond or communicate with mother again until early January 2013. S. claims that, as soon as he saw a picture of newborn Michael mother posted on Facebook, he knew the child was his. He claims he tried unsuccessfully to contact mother through her grandmother, mutual friends and Facebook. However, apart from S.'s self-serving declaration, there is no evidence he made any such effort until January 6, 2013, when he sent two Facebook messages saying, "hello" and asking, "Can u please have [mother] get at my pleaaaseee!!!" [sic] (Capitalization omitted.) S. did not ask mother about the

---

[2] The standard of review for *Kelsey S.*, *supra*, 1 Cal.4th 816 determinations remains somewhat unsettled. The substantial evidence standard typically applies where the party without the burden of proof below challenges a ruling in favor of the party that bore it. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) However, where, as here, the juvenile court "expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals," at least one court has concluded that the question on appeal "becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*Ibid.*) Because we conclude the court's order should remain undisturbed under either standard we need not decide which one governs.

pregnancy or where she planned to give birth, and there is no evidence he provided (or offered) financial assistance for pregnancy or medical expenses or that he attended the child's birth. The record reflects no further contact or attempted contact between S. and mother until October 4, 2013, when mother sent a message asking S. to contact her "asap" about this dependency action, and said he "[r]eally . . . [didn't] care about [his] son" who would soon "[b]e gone for good."

S. claims mother rejected his offer of assistance and hid Michael from him because she was afraid he would take the child from her. Although mother did initially withhold the true identity of Michael's biological father from DCFS, S. concedes he never doubted that Michael was his son. Nevertheless, the record does not demonstrate that S. publically acknowledged the child as his own, nor that he took prompt legal action to establish his paternity. S. provided no financial assistance or emotional support to mother during her pregnancy (she said he was "never there for" her), and extended only a single vague offer "to do something for the baby" shortly before Michael was born, while also making it clear he was happy with his current family situation and content to remain uninvolved. He never asked mother about the pregnancy, and never helped her obtain prenatal care nor paid any medical expenses. He did not ask to see the child, did nothing to suggest he was willing to share custody, took no legal action to seek custody of or to assume any responsibility for the child, and made no effort to establish a relationship with his son who was almost one year old and bonded with his caretaker by the time S. stepped up.

S. became involved only after learning Michael might be removed from mother's custody. At that point he sent mother a message saying, "Thought you had everything taken care of . . . all under control . . . Guess not . . . I'm just looking out for MY son," and asked her what to do because he "want[ed] custody of [Michael] so [he could] make sure he is okay and not taken away . . . ."

These facts do not make a case to support S.'s claim that mother impeded his "ability to become a father to his child. . . . [denying him] an opportunity to accept his child into his home, [and] thus denying him the opportunity to gain presumed status." S.

8

clearly had no intention to become involved before or after Michael's birth and so long as his child was in mother's care and until he feared that would change. A biological father who learns of the pregnancy prior to the baby's birth yet does nothing to assume parental responsibilities until after the birth is not entitled to *Kelsey S.*, *supra*, 1 Cal.4th 816 status. (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1055.)

S.'s argument for *Kelsey S.*, *supra*, 1 Cal.4th 816 status is based primarily on the testimony in his own declaration, in disregard of the prevailing standard of review. Yet even taking S.'s testimony at face value, it fails to satisfy *Kelsey S.* S. acknowledged that he knew mother was pregnant and believed the child was his as early as March 2012. Although S. claims he was ultimately put off by mother's statement to others that he was not the father, S. was well aware the child might be his—indeed he believed it was—as he was having sexual relations with mother at the time of Michael's conception. There is no evidence, either before or after their respective incarcerations, that S. accompanied mother to prenatal appointments, publicly acknowledged paternity during the pregnancy (even though he believed the child was his), provided mother any financial assistance or purchased any items for the child before his birth.[3]

Nor did S. provide mother any emotional support. On the contrary, according to mother, S. was "never there" for her before the child's birth and did not "want any part." He made a single tepid offer of assistance and expended no effort to establish his paternity or to facilitate any relationship with Michael. Even though he was always "certain that he [was] . . . the father," his first act after appearing in this action was to request a DNA test, and he conditioned his willingness to assume custody of Michael on proof the child was his biological offspring. (Compare, e.g., *Adoption of H.R.* (2012) 205 Cal.App.4th 455, 468

---

[3] S. appropriately does not argue that the fact of his incarceration prevented him from proving under *Kelsey S.*, *supra*, 1 Cal.4th 816 that he did "all that he reasonably could do under the circumstances. (*Id.* at p. 850, italics omitted.) At least one court has determined that incarceration during a pregnancy was no excuse for a father's failure to assume parental responsibilities. (See *In re Adoption of O.M.*, *supra*, 169 Cal.App.4th at pp. 680–681.)

[biological father qualified under *Kelsey S*, *supra*, 1 Cal.4th 816 by participating in prenatal care and, after being excluded by mother, filed an action claiming paternity, obtained his own DNA test, and actively sought physical and legal custody].) S.'s conduct was ambivalent at best and an insufficiently prompt or unequivocal assertion of parental rights to qualify under *Kelsey S.* S.'s disinclination to be involved with Michael or to seek custody continued even after mother posted photos of newborn Michael on Facebook and S. was certain the child was his son. Thus, S. failed to prove his willingness to assume full custody of Michael. S. failed to establish that he promptly stepped forward to assume full parental responsibilities for his son's well-being. He was not present when Michael was born, and did not visit the child or even inquire about his health. There is no evidence he paid any medical bills associated with the birth. S.'s lack of involvement with and lack of commitment to Michael both before and after his birth shows S. did not promptly step forward to assume full responsibility for the child's well-being. (See *Kelsey S.*, *supra*, 1 Cal.4th at p. 849 [when determining presumed father status, a court must consider a biological father's conduct before and after a child's birth].)

Finally, contrary to S.'s assertion, there is very little evidence mother prevented him from assuming his parental responsibilities after Michael's birth. Rather, the record reflects that S. chose from the outset to withdraw from his parental responsibilities, assuming for most of the first year of his son's life that mother alone "had everything taken care of . . . all under control." The evidence demonstrates that it was S.'s own conduct and decisions—not actions of a third party—that prevented him from assuming parental responsibilities.

Our decision in *In re D.A.* (2012) 204 Cal.App.4th 811 is instructive. There, the father and mother had a nonexclusive relationship when she got pregnant. The mother informed the father the baby might be his and he expressed a desire for a genetic test to determine if he was the baby's father. He also took mother to two doctor visits and offered to help with any associated expenses. Soon after, mother cut off contact with father, and he did not learn her whereabouts until after the child was born. He again requested a paternity test, but mother stalled, and no test was performed until after the child was detained due to mother's behavioral issues. After tests established that another man the court originally

found to be the presumed father was not the biological father, father attended the very next hearing and informed the court that, if he was the biological father, he wanted to form a relationship with the child. Genetic testing showed he was the biological father, and he requested presumed father status and visitation. He attended every hearing after that and consistently requested visitation. (*Id.* at pp. 824–825.) We held that the father had demonstrated *Kelsey S.*, *supra*, 1 Cal.4th 816 father status when "[d]uring [the] mother's pregnancy he expressed his desire for a genetic test to determine whether he was the baby's father, he took [the] mother to prenatal medical appointments, and he offered to help with any associated expenses. His involvement ended only because mother cut off contact with him . . . and he had no other way of reaching her."[4] (*In re D.A.*, at p. 824.) Here, in contrast, S.'s absence over the months before and after Michael was born, including the fact that he never expressed a desire for paternity testing before the child's birth, nor made any effort to provide mother financial or emotional support runs counter to the full parental commitment envisioned by *Kelsey S.*[5]

---

[4] On appeal, the previously named presumed father faulted father for having asserted, before he was determined to be the child's biological father, that he wished to be a father to the child only if the child was his. (*In re D.A.*, *supra*, 204 Cal.App.4th at p. 825.) This court rejected that contention observing that there was no requirement "that a *Kelsey S.*[, *supra*, 1 Cal.4th 816] father must unconditionally assert his parental rights even before knowing whether the minor is his biological child." (*In re D.A.*, at p. 825.) We do not suggest that a father forfeits presumed father status by requesting a DNA test. Nevertheless, a father must promptly "attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit" (*Kelsey S.*, at p. 849).

[5] For these reasons we find S.'s reliance on *In re Baby V.* (2006) 140 Cal.App.4th 1108, and *In re Jerry P.* (2002) 95 Cal.App.4th 793, inapt. In both cases, unlike here, the man seeking presumed father status came forward as soon as he learned of the child's existence, and promptly attempted to assume parental responsibilities and demonstrate a full parental commitment to the child. (See *In re Baby V.*, at p. 1117, and *In re Jerry P.*, at p. 812.)

In conclusion, S. failed to present sufficient evidence to prove the *Kelsey S.* requirements for presumed father status.  The juvenile court properly denied S.'s motion to be declared Michael's presumed father.[6]

2.     *There was no ICWA violation.*

S. claims that because he is Michael's biological father, the court erred in failing to inquire about his American Indian heritage and to provide notice under the ICWA.

The ICWA protects "Indian children who are members of or are eligible for membership in an Indian tribe."  (25 U.S.C. § 1901(3).)  For purposes of the ICWA, "'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."  (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subd. (b); *In re S.B.* (2005) 130 Cal.App.4th 1148, 1162.)

The ICWA requires that when the court "knows or has reason to know that an Indian child is involved," it must send notice to the appropriate tribe of the proceedings and of the tribe's right to intervene.  (25 U.S.C. § 1912(a).)  Neither the ICWA nor its implementing regulations impose a duty to inquire about Indian ancestry.  (See *In re H.B.* (2008) 161 Cal.App.4th 115, 120–121.)  But the statute permits states to provide "'a higher standard of protection to the rights of the parent . . . of an Indian child than the rights provided under [ICWA].'"  (*Id.* at p. 120; 25 U.S.C. § 1921.)  California has imposed on the juvenile court and DCFS an affirmative and continuing duty to inquire whether a child is or may be an Indian child.  (Welf. & Inst. Code, § 224.3, subd. (a); Cal. Rules of Court, rule 5.481(a); *In re S.B.*, *supra*, 130 Cal.App.4th at p. 1158.)  Upon a parent's first appearance, the juvenile court must also order the parent to complete a parental notification of Indian status form.  (Cal. Rules of Court, rule 5.481(a)(2).)  Nevertheless, under California's statutes and rules notice is required only if the court or

---

[6] Our conclusion that S. failed to establish his status as presumed father renders it unnecessary to address his assertion that the juvenile court erroneously required him to rebut Noel's preexisting status as presumed father.

DCFS "knows or has reason to know that an Indian child is involved." (Welf. & Inst. Code, § 224.3, subd. (d); Cal. Rules of Court, rule 5.481(b)(1); *In re Shane G.* (2008) 166 Cal.App.4th 1532, 1538–1539.) Failure to comply with the California notice requirements is "harmless unless the appellant can show a reasonable probability that he or she would have enjoyed a more favorable result in the absence of the error." (*In re S.B.*, *supra*, 130 Cal.App.4th at p. 1162; *In re H.B.*, *supra*, 161 Cal.App.4th at p. 121 ["A violation of ICWA notice requirements may be harmless error, particularly when, as here, the source of the duty to inquire is not ICWA itself but rather . . . a [California] rule of court implementing ICWA"].)

The record shows that mother and Noel each completed the parental notification of Indian status form and denied any American Indian ancestry. Even after his biological parentage was established S. was never asked to complete the form, nor did the juvenile court ask about his possible Indian ancestry on the record. This was error. (*In re H.B.*, *supra*, 161 Cal.App.4th at p. 121.)

The error, however, was harmless. S. has never asserted that he or Michael have Indian ancestry. He has not stated on appeal that he would have indicated that he had Indian heritage if he had filled out a notification of Indian status form, or if he had been asked directly by the court. This court and numerous others have held that ICWA notice need not be given when there is insufficient reason to believe a child is an Indian child. (See, e.g., *In re J.D.* (2010) 189 Cal.App.4th 118, 125 [notice not required where paternal grandmother indicated possible Indian ancestry, tribe unknown]; see also *In re Jeremiah G.* (2009) 172 Cal.App.4th 1514, 1516, 1520–1521 [mere assertion there was a "'possibility'" a parent's great-grandfather "'was Indian'" was too vague and speculative to require ICWA notice]; *In re O.K.* (2003) 106 Cal.App.4th 152, 154, 157 [grandmother's statement children may have Indian heritage, without identifying tribe, was "too vague and speculative to give the juvenile court any reason to believe the minors might be Indian children"]; *In re Levi U.* (2000) 78 Cal.App.4th 191, 194, 198 [paternal grandmother's statement there might be Indian ancestry on her mother's side, tribe unknown, was insufficient to trigger notice requirements].)

There is no indication in the record that Michael has Indian heritage through his biological father, and S.'s failure to claim on appeal that there nevertheless remains some basis to believe ICWA applies supports our conclusion that the juvenile court's error was harmless. (*In re H.B.*, *supra*, 161 Cal.App.4th at p. 122; *In re A.B.* (2008) 164 Cal.App.4th 832, 843.) To reverse (or even, as DCFS suggests, to conditionally affirm and remand for compliance with ICWA notice requirements), would cause Michael "additional unwarranted delay and hardship, without any showing whatsoever that the interests protected by the ICWA are implicated in any way." (*In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1431.) As the court stated in *In re Rebecca R.*, "Father is here, now, before this court. There is nothing whatever which prevented him, in his briefing or otherwise, from removing any doubt or speculation. He should have made an offer of proof or other affirmative representation that, had he been asked, he would have been able to proffer some Indian connection sufficient to invoke the ICWA. He did not. [¶] In the absence of such a representation, the matter amounts to nothing more than trifling with the courts. [Citation.]" (*Ibid.*) We also note that, despite the fact that DCFS pointed out in its respondent's brief S.'s failure to proffer any evidence on this issue, S.'s reply brief ignores the point.

**DISPOSITION**

The order is affirmed.

NOT TO BE PUBLISHED.

JOHNSON, J.

We concur:

CHANEY, Acting P. J.

BENDIX, J.*

---

15